United States Court of Appeals,

Eleventh Circuit.

No. 96-8130.

Vicky LEWIS, individually as parent, as next friend and as administrator of the estate of Kathryn C. Lewis, Gary Lewis, individually as parent, as next friend and as administrator of the estate of Kathryn C. Lewis, Plaintiffs-Appellants,

v.

BRUNSWICK CORPORATION, Defendant-Appellee.

March 21, 1997.

Appeal from the United States District Court for the Southern District of Georgia. (No. CV 195-096), Dudley H. Bowen, Jr., District Judge.

Before BIRCH, BLACK and CARNES, Circuit Judges.

CARNES, Circuit Judge:

Gary and Vicky Lewis appeal the district court's grant of summary judgment in favor of Brunswick Corporation ("Brunswick") on the Lewises' state common law negligence, product liability, and fraudulent misrepresentation claims. The Lewises sued Brunswick to recover damages for the death of their daughter, who died after she fell or was thrown from a boat and then struck by a Brunswick engine propeller. According to the Lewises, the Brunswick engine involved in their daughter's death was defective because it lacked a propeller guard. Upon Brunswick's motion for summary judgment, the district court held that the Lewises' claims were preempted by the Federal Boat Safety Act, 46 U.S.C. §§ 4301-4311 ("the FBSA" or "the Act"). We affirm.

In Part I of this opinion, we describe the facts and the procedural history of this case. We describe the standard of review in Part II, and we outline the Act and its regulatory scheme

in Part III. In Part IV, we recount the actions taken by the Coast Guard regarding propeller guards. We then summarize the positions of the parties in Part V of the opinion. In Part VI, we describe in general terms how state law may be preempted. We then proceed to consider, in Parts VII and VIII of the opinion, whether the Lewises' claims are preempted by the Act.

As we will explain in Part VII, the preemption clause and the savings clause in the Act provide contradictory indications of congressional intent relating to whether the Lewises' claims are expressly preempted. Because the text of the FBSA does not provide a clear manifestation of intent to preempt the claims, we cannot hold that they are expressly preempted. On the other hand, due to the conflict between the preemption clause and the savings clause, we cannot hold that those claims are expressly saved from preemption either. Consequently, our resolution of the question of preemption in this case turns on whether the Lewises' claims are impliedly preempted by the Act. We hold that they are, because those claims conflict with the Coast Guard's position that propeller guards should not be required.

## I. FACTS AND PROCEDURAL HISTORY

On June 6, 1993, Kathryn Lewis was spending the day with her boyfriend's family in a boat on Strom Thurmond Lake in Georgia. While the boat was pulling Kathryn's boyfriend on an inner tube, the driver made a right-hand turn. Kathryn fell or was thrown from the left side of the boat. Once in the water, Kathryn was struck repeatedly in the head and body by the propeller of an engine designed and manufactured by Brunswick. The engine did not have a

propeller guard.  Kathryn died instantly.

The Lewises filed suit against Brunswick in Georgia state court, alleging that the lack of a propeller guard made the Brunswick engine a defective product.  They also claim that Brunswick committed negligence by failing to install a propeller guard on the engine.  The Lewises' third claim avers that Brunswick attempted to suppress the production of propeller guards by third persons and exaggerated the performance differences between guarded engines and unguarded engines to discourage government agencies from adopting a safety standard requiring propeller guards.

Brunswick removed this case to federal district court on diversity grounds and moved for summary judgment.  In its summary judgment motion, Brunswick contended that all of the Lewises' claims were preempted by the FBSA.  The district court agreed and granted summary judgment in favor of Brunswick.  The Lewises appeal.

## II. STANDARD OF REVIEW

We apply the same legal standards in our preemption analysis that the district court was required to apply in its order granting summary judgment;  therefore, we review the district court's decision *de novo.  E.g., Southern Solvents, Inc. v. New Hampshire Ins. Co.,* 91 F.3d 102, 104 (11th Cir.1996).

## III. THE FEDERAL BOAT SAFETY ACT

The FBSA was enacted in 1971 in part "to improve boating safety by requiring manufacturers to provide safer boats and boating equipment to the public through compliance with safety standards to be promulgated by the Secretary of the Department in

which the Coast Guard is operating—presently the Secretary of Transportation." *P.L. 92-75, Federal Boat Safety Act of 1971,* S.Rep. No. 92-248, *reprinted in* 1971 U.S.C.C.A.N. 1333. To implement that goal, the Act grants authority to the Secretary of Transportation to prescribe regulations establishing minimum safety standards for recreational boats. *See* 46 U.S.C. § 4302 (West Supp.1995). The Secretary of Transportation has delegated rulemaking authority under the FBSA to the United States Coast Guard. *See* 49 C.F.R. § 1.46(n)(1) (1996).

The FBSA requires the Coast Guard to follow certain guidelines and procedures when promulgating a regulation under 46 U.S.C. § 4302. For instance, the Coast Guard must consider certain available data and "the extent to which the regulations will contribute to recreational vessel safety." 46 U.S.C.A. § 4302(c)(1)-(2) (West Supp.1995). The Coast Guard may not establish regulations compelling substantial alterations of existing boats and associated equipment unless compliance would "avoid a substantial risk of personal injury to the public." 46 U.S.C.A. § 4302(c)(3) (West Supp.1995). Before promulgating a regulation, the Coast Guard is required to consult with the National Boating Safety Advisory Council ("the Advisory Council") on the need for regulation. 46 U.S.C. § 4302(c)(4).

## IV. COAST GUARD CONSIDERATION OF A PROPELLER GUARD REGULATION

In 1988, the Coast Guard directed the Advisory Council to examine the feasibility and potential safety advantages and safety disadvantages of propeller guards. In response, the Advisory Council appointed a Propeller Guard Subcommittee "to consider,

review and assess available data concerning the nature and incidence of recreational boating accidents in which persons in the water are struck by propellers." National Boating Safety Advisory Council, Report of the Propeller Guard Subcommittee 1 (1989) ("Report"). The Advisory Council also asked the Subcommittee to consider whether "the Coast Guard [should] move towards a federal requirement for some form of propeller guard." *Id.* at Appendix A.

The Advisory Council Subcommittee held hearings on three occasions and received information from a variety of individuals and groups interested in the topic of propeller guards. *See id.* at 2-4. One of the matters on which the Subcommittee received information was propeller guard litigation, and the Subcommittee devoted a section of its report to the topic. *Id.* at 4. That section states that, at the time of the hearings, propeller guard advocates were petitioning federal and state legislators to mandate propeller guards. According to the Subcommittee Report, a legislative or administrative mandate "would necessarily be predicated on the feasibility of guards and establish prima facie manufacturer liability in having failed to provide them"; therefore, feasibility was an important question before the Subcommittee. *Id.* at 5. The report also discusses the theories of liability that were being asserted by propeller guard victims and the defenses used by manufacturers. *Id.* at 4-5. Immediately following that discussion, the report notes that "[m]anufacturers are opposed to mandatory propeller guards." *Id.* at 5.

The Subcommittee also considered the technical issues posed by propeller guards. After reviewing the available scientific data

and testimony, the Subcommittee found that propeller guards affect boat operation adversely at speeds greater than 10 miles per hour. *Id.* at 21. Further, the Subcommittee found that propeller guards would not increase overall safety, because they increase the chances of contact between a blunt object and a person in the water. *Id.* at 20-21. The Subcommittee Report states:

> Injuries/fatalities caused by underwater impacts result from a person coming into contact with the propeller or any part of the propulsion unit (i.e., lower unit, skeg, torpedo, anti-ventilation plate, etc.) and even the boat itself. Currently reported accidents make it obvious that all such components are involved in the total picture, and that the propeller itself is the sole factor in only a minority of impacts. The development and use of devices such as "propeller guards' can, therefore, be counter-productive and can create new hazards of equal or greater consequence.... Although the controversy which currently surrounds the issue of propeller guarding is, by its very nature, highly emotional and has attracted a great deal of publicity, there are no indications that there is a generic or universal solution currently available or foreseeable in the future. The boating public must not be misled into thinking there is a "safe" device which would eliminate or significantly reduce such injuries or fatalities.

*Id.* at 23-24. The report also states that:

> boats and motors should be designed to incorporate technologically feasible safety features to avoid or minimize the consequences of inexperienced or negligent operation, without at the same time (a) creating some other hazard, (b) materially interfering with normal operations, or (c) being at economic costs disproportionate to the particular risk.
>
> Proponents assert that propeller guard technology and/or availability meets the foregoing criteria and that guards should not be mandated. The Subcommittee does not agree....

*Id.* at 20. In its conclusion, the Advisory Council Subcommittee Report recommends that "[t]he U.S. Coast Guard should take no regulatory action to require propeller guards." *Id.* at 24.

The Subcommittee presented its report to the entire Advisory Council, which accepted the report and adopted the recommendations

of the Subcommittee. Minutes of the 44th Meeting of the National Boating Safety Advisory Council 19 (Nov. 6-7, 1989). The Advisory Council then forwarded the report and recommendations to the Coast Guard. The Coast Guard adopted each of the Advisory Council's recommendations, giving explanations of the Coast Guard's position on each matter. *See* Letter from Robert T. Nelson, Rear Admiral, U.S. Coast Guard, Chief, Office of Navigation, Safety and Waterway Services to A. Newell Garden, Chairman, National Boating Safety Advisory Council (Feb. 1, 1990). The Coast Guard's position on propeller guards, which is set out in that letter, is as follows:

> The regulatory process is very structured and stringent regarding justification. Available propeller guard accident data do not support imposition of a regulation requiring propeller guards on motorboats. Regulatory action is also limited by the many questions about whether a universally acceptable propeller guard is available or technically feasible in all modes of boat operation. Additionally, the question of retrofitting millions of boats would certainly be a major economic consideration.

> The Coast Guard will continue to collect and analyze data for changes and trends; and will promote increased/improved accident reporting as addressed in recommendation 2. The Coast Guard will also review and retain any information made available regarding development and testing of new propeller guard devices or other information on the state of the art.

*Id.* at 1.

## V. POSITIONS OF THE PARTIES

The Lewises contend that the FBSA does not expressly or impliedly preempt state law tort claims based on the absence of a propeller guard on a boat engine. According to the Lewises, common law claims are expressly saved from preemption by the Act's savings clause. Furthermore, the Lewises argue, the Act does not preempt any state law, regulation, or claims until the Coast Guard issues a formal regulation on the matter. There being no regulation on

propeller guards, the Lewises assert they may proceed with their case.

In response, Brunswick argues that the FBSA expressly preempts any state regulation, including regulation through common law claims, that conflicts with a Coast Guard regulation or regulatory position. Brunswick contends that the Coast Guard has made a regulatory decision that propeller guards cannot be required. For that reason, Brunswick says, the Lewises' claims are expressly preempted by the Act. Furthermore, even if the Lewises' claims are not expressly preempted, Brunswick argues that the claims conflict with the Coast Guard's position that propeller guards should not be required. For that reason, Brunswick contends, the claims are preempted by implication.

## VI. AN OVERVIEW OF PREEMPTION DOCTRINE

Any state law that conflicts with federal law is preempted by the federal law and is without effect under the Supremacy Clause of the Constitution. *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992). State regulation established under the historic police powers of the states is not superseded by federal law unless preemption is the clear and manifest purpose of Congress. *Id.* Accordingly, the intent of Congress is the touchstone of preemption analysis. *See id.*

Congressional intent to preempt state law may be revealed in several ways: (1) "express preemption," in which Congress defines explicitly the extent to which its enactments preempt state law; (2) "field preemption," in which state law is preempted because

Congress has regulated a field so pervasively, or federal law touches on a field implicating such a dominant federal interest, that an intent for federal law to occupy the field exclusively may be inferred; and (3) "conflict preemption," in which state law is preempted by implication because state and federal law actually conflict, so that it is impossible to comply with both, or state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Teper v. Miller,* 82 F.3d 989, 993 (11th Cir.1996) (citations omitted).

By including an express preemption clause in the FBSA, Congress has demonstrated its intent that the Act preempt at least some state law. *See* 46 U.S.C. § 4306. Therefore, the issue in this case is not whether Congress intended for the FBSA to have any preemptive effect, but the intended scope of preemption—the extent to which the FBSA preempts state law. *See Medtronic, Inc. v. Lohr,* --- U.S. ----, ----, 116 S.Ct. 2240, 2250, 135 L.Ed.2d 700 (1996). In areas traditionally regulated by the states through their police powers, we apply a presumption in favor of a narrow interpretation of an express preemption clause. *Id.* at ----, 116 S.Ct. at 2250.

## VII. EXPRESS PREEMPTION

Brunswick contends that the Lewises' claims fall within the scope of the FBSA's express preemption clause, which provides:

Unless permitted by the Secretary under section 4305 of this title, a State or a political subdivision of a State may not establish, continue in effect, or enforce a law or regulation establishing a recreational vessel or associated equipment performance or other safety standard or imposing a requirement for associated equipment (except insofar as the State or political subdivision may, in the absence of the Secretary's disapproval, regulate the carrying or use of marine safety articles to meet uniquely hazardous conditions or circumstances within the State) that is not identical to a

regulation prescribed under section 4302 of this title.
46 U.S.C.A. § 4306 (West Supp.1995). According to Brunswick, the Lewises' claims, if successful, would result in a regulation imposing a propeller guard requirement. That regulation would not be identical to—in fact, it would be in conflict with—the Coast Guard's position that propeller guards should not be required. In Brunswick's view, the Coast Guard's position is equivalent to a "regulation prescribed under section 4302," which preempts state law. Following this reasoning, Brunswick argues that the Lewises' claims are preempted by the express terms of the FBSA preemption clause.

In response, the Lewises contend that the phrase "law or regulation" does not reach common law claims, because Congress did not mention "common law" specifically in the preemption clause. According to the Lewises, Congress' decision not to specify "common law" in the preemption clause demonstrates congressional intent to save common law claims. As Brunswick points out, however, the omission of the phrase "common law" in the preemption clause is not determinative, because "law" and "regulation" may be read to include state tort actions. *See Cipollone,* 505 U.S. at 520-30, 112 S.Ct. at 2619-25 (1992) (plurality opinion) (holding that the phrase "State law" in the Federal Cigarette Labeling and Advertising Act was intended to include common law claims); *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664, 113 S.Ct. 1732, 1737, 123 L.Ed.2d 387 (1993) (common law claims fall within the scope of the phrases "law, rule, regulation, order, or standard"). In fact, the overwhelming majority of courts have held that common

law claims fall within the scope of "law[s]" and "regulation[s]" expressly preempted by the FBSA. *See Moss v. Outboard Marine Corp.,* 915 F.Supp. 183, 186 (E.D.Cal.1996); *Davis v. Brunswick Corp.,* 854 F.Supp. 1574, 1580 (N.D.Ga.1993); *Shield v. Bayliner Marine Corp.,* 822 F.Supp. 81, 84 (D.Conn.1993); *Shields v. Outboard Marine Corp.,* 776 F.Supp. 1579, 1581 (M.D.Ga.1991); *Mowery v. Mercury Marine,* 773 F.Supp. 1012, 1017 (N.D.Ohio 1991); *Farner v. Brunswick Corp.,* 239 Ill.App.3d 885, 180 Ill.Dec. 493, 497-98, 607 N.E.2d 562, 566-67 (1992); *Ryan v. Brunswick Corp.,* 454 Mich. 20, 557 N.W.2d 541, 548-49 (1997). *Contra Moore v. Brunswick Bowling & Billiards Corp.,* 889 S.W.2d 246, 250 (Tex.), *cert. denied,* --- U.S. ----, 115 S.Ct. 664, 130 L.Ed.2d 599 (1994).

We agree that the terms "law" and "regulation" evidence an intent to include common law claims. However, we stop short of concluding that common law claims are expressly preempted by the FBSA, because another provision in the Act pulls us away from that conclusion. As the Lewises point out, Congress included a savings clause in the Act, which seems to save common law claims from preemption. That clause, which is found within the section of the Act entitled "Penalties and Injunctions," provides:

> Compliance with this chapter or standards, regulations, or orders prescribed under this chapter does not relieve a person from liability at common law or under State law.

46 U.S.C.A. § 4311(g) (West Supp.1995).

Because the FBSA preempts an area (safety) that historically has been regulated by the states through their police powers, we must construe the Act's preemption clause narrowly. *See Medtronic,* --- U.S. at ----, 116 S.Ct. at 2250. The preemption clause easily

could be read to cover common law claims, but because the savings clause indicates that at least some common law claims survive express preemption, we cannot give the preemption clause that broad reading. Instead, we must resolve doubts in favor of the narrower interpretation of the preemption clause and conclude that the express preemption clause does not cover common law claims. We hold that those claims are not expressly preempted.

The Lewises urge us to go further and hold that the savings clause demonstrates clear congressional intent to save common law claims from preemption. We find congressional intent to be less than clear, given the conflicting language in the preemption and savings clauses. Just as the conflict between those provisions prevents us from concluding that the Lewises' claims are expressly preempted, so also does that conflict prevent us from concluding that those claims are expressly saved. *See Taylor v. General Motors Corp.,* 875 F.2d 816, 825 (11th Cir.1989) (interpreting the National Traffic and Motor Vehicle Safety Act). The express terms of the FBSA simply fail to answer the question of whether Congress intended to preempt common law claims. As a result, our decision about preemption depends on whether the Lewises' claims are impliedly preempted by federal law. *See id.* at 827-28.

## VIII. IMPLIED CONFLICT PREEMPTION

The Lewises' claims are preempted impliedly by the FBSA to the extent that those claims conflict with the "accomplishment and execution of the full purposes and objectives of Congress." *See Freightliner Corp. v. Myrick,* 514 U.S. 280, ----, 115 S.Ct. 1483, 1487, 131 L.Ed.2d 385 (1995). In other words, the Lewises' claims

are preempted if they prevent or hinder the FBSA from operating the way Congress intended it to operate. In deciding whether the Lewises' claims conflict with the purposes of the FBSA, we do not apply a presumption against preemption, even though common law tort claims are a mechanism of the police powers of the state. *Taylor,* 875 F.2d at 826. "Under the Supremacy Clause of the Federal Constitution, "[t]he relative importance to the State of its own law is not material when there is a conflict with a valid federal law,' for "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield.' " *Felder v. Casey,* 487 U.S. 131, 138, 108 S.Ct. 2302, 2307, 101 L.Ed.2d 123 (1988) (citations omitted).

According to Brunswick, the Lewises' claims are preempted by implication because those claims would interfere with the regulatory scheme enacted by Congress in the FBSA. Brunswick argues that the Coast Guard has the last say on whether a safety feature on boats or associated equipment should be required. Where the Coast Guard believes that a safety feature should not be required, Brunswick argues that states may not require the feature, even through common law claims.

"[A] federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left *un*regulated, and in that event would have as much preemptive force as a decision *to* regulate." *Arkansas Elec. Cooperative Corp. v. Arkansas Pub. Serv. Comm'n,* 461 U.S. 375, 384, 103 S.Ct. 1905, 1912, 76 L.Ed.2d 1 (1983) (emphasis in original). Though a decision not to regulate does not always have preemptive effect,

*see Puerto Rico Dept. of Consumer Affairs v. Isla Petroleum Corp.,* 485 U.S. 495, 503, 108 S.Ct. 1350, 1355, 99 L.Ed.2d 582 (1988), it does "where [the] failure of ... federal officials affirmatively to exercise their full authority takes on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute." *Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 178, 98 S.Ct. 988, 1004, 55 L.Ed.2d 179 (1978) (citations omitted).

The Lewises argue that the rule of *Atlantic Richfield* does not apply here, because Congress did not intend for a mere decision not to regulate to have preemptive effect under the FBSA. In the Lewises' view, any state regulation on boat and equipment safety standards is permissible, unless the Coast Guard promulgates a regulation that conflicts with the state regulation. As the Lewises understand the FBSA regulatory scheme, a Coast Guard position not to impose a safety standard on a matter leaves room for states to impose safety standards on that matter. There being no regulation on propeller guards, the Lewises argue that their claims are not affected by the Coast Guard's position. For support, they point to *Freightliner Corp. v. Myrick,* 514 U.S. 280, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995), a case in which the Supreme Court concluded that an absence of regulation on a safety matter did not preempt state common law claims imposing such standards.

In *Freightliner,* the Supreme Court considered whether common law claims based on the failure to install antilock brakes were expressly or impliedly preempted by the Vehicle Safety Act. *See id.* at ----, 115 S.Ct. at 1485. The preemption clause in the

Vehicle Safety Act provided:

> Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard.

15 U.S.C.A. § 1392(d) (West 1982) (repealed 1994). The defendants in *Freightliner* argued that the failure-to-install claims were preempted, because the relevant agency had indicated its intent to regulate braking systems by promulgating a regulation on that matter. That regulation was struck down by an appellate court, but the defendants in *Freightliner* believed it still had preemptive effect, because it demonstrated the agency's intent to forbid state regulation on braking systems. *Id.* at ----, 115 S.Ct. at 1487.

The Supreme Court rejected that argument. First, the Court explained, there was no evidence that the Vehicle Safety Act gave the relevant federal agency exclusive authority to issue safety standards. *Id.* In fact, the preemption clause in that act clearly implied that states could impose safety standards on auto manufacturers, until the federal government came forward with a different standard. Therefore, under the Vehicle Safety Act regulatory scheme, the absence of regulation failed to have preemptive effect under the *Atlantic Richfield* doctrine; instead, the agency's failure to put into effect a valid regulation left the state common law intact. *Id.* Furthermore, the Court reasoned, *Atlantic Richfield* was inapposite because:

> the lack of federal regulation [on antilock brakes] did not result from an affirmative decision of agency officials to refrain from regulating air brakes. [The agency] did not

decide that the minimum, objective safety standard required by 15 U.S.C. § 1392(a) should be the absence of all standards, both federal and state.

*Id.* (footnote omitted).

In contrast to the Vehicle Safety Act, the FBSA was intended to give its regulatory agency—the Coast Guard—exclusive authority to issue safety standards:

> This section [containing the preemption clause] provides for federal preemption in the issuance of boat and equipment safety standards. This conforms to the long history of preemption in maritime safety matters and is founded on the need for uniformity applicable to vessels moving in interstate commerce. In this case it also assures that manufacture for the domestic trade will not involve compliance with widely varying local requirements. At the same time, it was recognized that there may be serious hazards which are unique to a particular locale and which would justify variances at least with regard to the carriage or use of marine safety articles on boats. Therefore, the section does permit individual States to impose requirements with respect to carrying or using marine safety articles which go beyond the federal requirements when necessary to meet uniquely hazardous local conditions or circumstances. A right of disapproval, however, is reserved to the Secretary to insure that indiscriminate use of state authority does not seriously impinge on the basic need for uniformity.
>
> The section does not preempt state law or regulation directed at safe boat operation and use, which was felt to be appropriately within the purview of state or local concern.

S.Rep. No. 92-248, *reprinted in* 1971 U.S.C.C.A.N. at 1341. *See Elliott v. Brunswick Corp.,* 903 F.2d 1505, 1508 (11th Cir.1990) ("[T]he [FBSA] gives the Coast Guard the exclusive responsibility for establishing safety regulations.") (dicta); *Williams v. U.S. Dept. of Transportation,* 781 F.2d 1573, 1577 & n. 4 (11th Cir.1986) (with the FBSA Congress expressly preempted state regulation regarding performance and safety standards for boats and associated equipment) (dicta). While an absence of regulation under the Vehicle Safety Act does not prevent states from regulating motor

vehicle safety standards, an absence of federal regulation under the FBSA means that no regulation, state or federal, is appropriate. *Freightliner* is distinguishable for that reason.

Also in contrast to *Freightliner,* the relevant agency here, the Coast Guard, *did* make an affirmative decision to refrain from regulating propeller guards. Unlike the agency in *Freightliner,* the Coast Guard did not try to promulgate a regulation, and then fail, under a statutory scheme that would leave state law intact in the absence of federal regulatory action. Instead, under a statutory scheme that forbids any state standard or regulation "not identical to" a federal regulation, the Coast Guard decided not to issue a regulation. After consulting with the Advisory Council and reviewing the available data, the Coast Guard reached a carefully considered decision that "[a]vailable propeller guard accident data do not support imposition of a regulation requiring propeller guards on motorboats."

The Coast Guard did not decide that only a federal regulation would be inappropriate, but that the scientific data counseled against any regulation requiring propeller guards. Given that Congress intended for the FBSA to create a uniform system of regulation, and that the Coast Guard has determined that propeller guards should not be required, the Coast Guard's position mandates an absence of both federal and state propeller guard requirements. *See Ryan v. Brunswick Corp.,* 454 Mich. 20, 557 N.W.2d 541, 549-50 (1997). *See also Puerto Rico,* 485 U.S. at 503, 108 S.Ct. at 1355 ("Where a comprehensive federal scheme intentionally leaves a portion of the regulated field without controls, *then* the

preemptive inference can be drawn—not from federal inaction alone, but from inaction joined with action.") (emphasis in original). *Freightliner* does not require that we hold otherwise.

But the Lewises contend that even if *Freightliner* is not controlling here, we cannot find an implied conflict between their claims and the Act, because we know from the savings clause that Congress expected some common law claims to be brought in this area. About the savings clause, the Senate report says:

> This section is a Committee amendment and is intended to clarify that compliance with the Act or standards, regulations, or orders promulgated thereunder, does not relieve any person from liability at common law or under State law. The purpose of the section is to assure that in a product liability suit mere compliance by a manufacturer with the minimum standards promulgated under the Act will not be a complete defense to liability. Of course, depending on the rules of evidence of the particular judicial forum, such compliance may or may not be admissible for its evidentiary value.

S.Rep. No. 92-248, *reprinted in* 1971 U.S.C.C.A.N. at 1352.

From the savings clause, we know that Congress understood at least some product liability claims to be consistent with the FBSA regulatory scheme. In order to decide which claims, we must determine when product liability claims can be brought without upsetting the overall scheme Congress intended. Addressing that question, several courts have held that the only claims which do not present a conflict with the FBSA regulatory scheme are product liability claims based on the defective design or installation of products that are already installed, as opposed to claims based on the failure to install a certain safety device. *See Carstensen v. Brunswick Corp.,* 49 F.3d 430, 432 (8th Cir.), *cert. denied,* --- U.S. ----, 116 S.Ct. 182, 133 L.Ed.2d 120 (1995); *Moss v. Outboard*

*Marine Corp.,* 915 F.Supp. 183, 187 (E.D.Cal.1996); *Mowery v. Mercury Marine,* 773 F.Supp. 1012, 1017 (N.D.Ohio 1991); *Rubin v. Brutus Corp.,* 487 So.2d 360, 363 (Fla.Dist.Ct.App.1986); *Farner v. Brunswick Corp.,* 239 Ill.App.3d 885, 180 Ill.Dec. 493, 498, 607 N.E.2d 562, 567 (1992); *Ryan v. Brunswick Corp.,* 209 Mich.App. 519, 531 N.W.2d 793, 796 n. 1 (1995), *aff'd,* 454 Mich. 20, 557 N.W.2d 541 (1997); *Mulhern v. Outboard Marine Corp.,* 146 Wis.2d 604, 432 N.W.2d 130, 134-35 (1988). Permitting product liability claims against manufacturers for negligent or defective design of products required by the Coast Guard, or for products provided voluntarily by manufacturers, simply requires manufacturers to comply with FBSA regulations, and to do any additional manufacturing, in a non-negligent and non-defective manner. Permitting such claims is consistent with the FBSA scheme, which is designed to ensure that boats and associated equipment are safe.

By contrast, claims based on the failure to install a product that the Coast Guard has decided should not be required would conflict with the regulatory uniformity purpose of the FBSA. Without doubt, the Lewises' product liability claims seek to impose a propeller guard requirement. *See Carstensen,* 49 F.3d at 432. That requirement conflicts with the FBSA's grant of exclusive regulatory authority to the Coast Guard, and for that reason those claims are in conflict with and therefore preempted by the Act.

The Lewises argue that their fraud claim should be treated differently from their other claims, because it would not create a propeller guard requirement beyond FBSA requirements. We disagree. If the Lewises succeeded with their fraud claim, a jury could

impose liability upon Brunswick for attempting to persuade the Coast Guard and others that propeller guards are unsafe. The necessary element of causation in any such claim would be that but for the wrongful conduct of Brunswick, propeller guards would have been required by the Coast Guard. Such a judgment would conflict with the Coast Guard's position that propeller guards should not be required. Thus, the fraud claim is impliedly preempted by the Coast Guard's position and the preemptive effect given that position by the FBSA.

Regulatory fraud claims of this nature are impliedly preempted for fundamental, systemic reasons. Permitting such claims would allow juries to second-guess federal agency regulators through the guise of punishing those whose actions are deemed to have interfered with the proper functioning of the regulatory process. If that were permitted, federal regulatory decisions that Congress intended to be dispositive would merely be the first round of decision making, with later more important rounds to be played out in the various state courts. Virtually any federal agency decision that stood in the way of a lawsuit could be challenged indirectly by a claim that the industry involved had misrepresented the relevant data or had otherwise managed to skew the regulatory result. Ironically, such circumvention of the regulatory scheme likely would be more pronounced where, as here, Congress mandated more extensive industry input into the regulatory process. *See* 46 U.S.C. § 4302(c). Congress could not have intended for the process it so carefully put in place to be so easily and thoroughly

undermined.[1]

In sum, we conclude that because Congress has made the Coast Guard the exclusive authority in the area of boat and equipment safety standards, its position rejecting a propeller guard requirement takes on the character of a ruling that no such requirement may be imposed. That position impliedly preempts state law requirements of propeller guards, even in the form of common law claims. It also prevents plaintiffs from bringing fraud claims intended to demonstrate that the Coast Guard would have reached a different conclusion on the matter of propeller guards but for alleged industry manipulation or subversion of the federal regulatory process. We hold that each of the Lewises' claims is preempted by implication because it conflicts with the Coast Guard's position on propeller guards and would interfere with the FBSA regulatory process designed by Congress.

## IX. CONCLUSION

The district court's grant of summary judgment to Brunswick is AFFIRMED.

---

[1]The Lewises' claim may be read to address alleged fraudulent misrepresentations by Brunswick to individuals and groups outside the federal government. To the extent that the Lewises intended to hold Brunswick liable for allegedly dissuading other manufacturers from installing propeller guards, their claim fails on causation grounds, because their daughter was struck by a propeller on a Brunswick motor. To the extent that the Lewises seek to hold Brunswick liable for alleged fraud upon state regulators, their fraud claim is preempted because state regulatory decisions of the propeller guard issue are themselves preempted.