## A01A0050. DUREN v. PACCAR, INC.
### (549 SE2d 755)

RUFFIN, Judge.

Peyton Duren was killed when a tractor-trailer truck manufactured by Paccar, Inc. collided with his pickup truck. Duren's surviving spouse, Tammy Duren, sued Paccar, alleging the company is liable under state tort law for defectively designing and manufacturing the truck. Paccar moved for summary judgment, arguing that state law is preempted by federal law, which bars Duren's claim. The trial court granted Paccar's motion, and Duren appeals. For reasons that follow, we reverse.

Summary judgment is appropriate where the moving party establishes "that there is no genuine issue as to any material fact and that the [movant] is entitled to a judgment as a matter of law."[1] On appeal from the grant of summary judgment, we review the trial court's judgment de novo to determine whether the evidence of record, viewed in the light most favorable to the nonmoving party, demonstrates any genuine issue of material fact.[2]

Viewed in this light, the evidence shows that on the day of the incident, May 3, 1997, Mildred Anderson was driving a truck tractor pulling an empty trailer. Immediately before the fatal collision, Anderson applied her brakes to avoid hitting a car in front of her, causing the truck to suddenly jackknife and swerve into oncoming traffic. The truck ultimately collided with the car driven by Peyton Duren.

The truck Anderson was driving was made by Paccar and came off the manufacturing line on September 19, 1996. When Paccar manufactured the truck, it did not install any safety devices to prevent jackknifing during braking when the truck is pulling a lightly loaded trailer. At the time, there were three safety devices that Paccar could have installed on the truck to reduce the risk of jackknifing: an antilock braking system ("ABS"), a load sensitive proportioning valve ("LSV"), and a manual limiting valve ("MLV").

Although Paccar maintains that it offered an ABS as "standard" equipment on the truck driven by Anderson, her employer, who leased the truck, stated that he was never informed of the need for an ABS or that it was available on the truck he leased. Instead, it appears that the dealership that ordered the truck merely deleted the "standard" ABS as a feature for the truck, without informing Anderson's employer. According to Paccar's manager of product safety and compliance, the cost of the ABS was then "returned to the dealer for not ordering ABS."[3] Thus, the truck was not equipped with an ABS, nor was it equipped with a LSV or a MLV, which were not available as either standard or optional features on the truck.

In her complaint, Duren alleged, among other counts, that Paccar is liable under state product liability law because the truck lacked a safety device to prevent it from jackknifing. In its motion for summary judgment, Paccar argued that the safety devices that it could have installed on the truck were not required under federal

---

[1] OCGA § 9-11-56 (c).

[2] See *Leal v. Hobbs*, 245 Ga. App. 443 (538 SE2d 89) (2000); *Gentry v. Volkswagen of America*, 238 Ga. App. 785 (521 SE2d 13) (1999).

[3] To the extent that the trial court granted summary judgment to Paccar because Anderson's employer rejected this "standard" equipment, the court erred. A factual issue clearly exists concerning whether the ABS was a standard feature or optional equipment.

standards, which preempted state law. The trial court granted the motion, and on appeal Duren asserts that the trial court erred because the federal law concerning these safety devices did not preempt state tort law.

In addressing this issue, we note initially that as a general rule, "compliance with federal standards or regulations will not bar manufacturer liability for design defect as a matter of law."[4] This is because under the risk-utility analysis applied to claims of design defects, compliance with federal standards or regulations is only one factor, among many, that the jury may consider in deciding the question of reasonableness.[5] Where, however, Congress has expressed its intent, through federal laws or regulations, that federal law should preempt state law, any state law that conflicts with the federal law "is without effect."[6] Federal law may preempt state law by: "(1) express preemption; (2) field preemption (regulating the field so extensively that Congress clearly intends the subject area to be controlled only by federal law); and (3) implied (or conflict) preemption."[7] Here, Paccar contends that the federal law expressly and impliedly preempts state law.

1. *Express Preemption.* To determine whether Congress intended to expressly preempt state product liability law, we must review the federal regulatory history concerning braking standards for heavy trucks such as the one involved here. The standard at issue, Motor Vehicle Safety Standard 121, was originally promulgated by the National Highway Traffic Safety Administration ("NHTSA") in 1970 with a proposed effective date of January 1, 1972.[8] The standard generally required a braking system which would stop a truck within a certain distance without the truck leaving its lane of travel.[9] That standard, however, received considerable opposition from the truck manufacturing industry, and the effective date was postponed to 1974.[10] Because that standard required the installation of an ABS, and there were unforeseen problems developing the new braking system, in 1978 the Court of Appeals for the Ninth Circuit suspended its implementation.[11]

In the early 1990s NHTSA revisited braking standards for large trucks.[12] In 1992, NHTSA issued an Advance Notice of Proposed

---

[4] *Doyle v. Volkswagenwerk Aktiengesellschaft*, 267 Ga. 574, 577 (481 SE2d 518) (1997).

[5] See id.

[6] (Punctuation omitted.) *Gentry*, supra at 787 (2).

[7] Id.

[8] See *Paccar, Inc. v. Nat. Hwy. Traffic Safety Admin.*, 573 F2d 632, 636 (9th Cir. 1978).

[9] See id.

[10] See id. at 637.

[11] See id. at 640, 645-646.

[12] See 57 FR 24212 (1992).

Rulemaking which discussed the brake designs and equipment under consideration.[13] After noting the relative merits of several braking systems, including ABSs and LSVs, NHTSA found that ABSs appeared "to be the most reliable method of preventing loss of stability and steering control," and invited comment on its findings.[14]

In 1993, after the comment period, NHTSA proposed amending Standard 121 to expressly require that all large trucks be equipped with ABS.[15] On March 10, 1995, NHTSA published its final ruling requiring large trucks to be equipped with ABS.[16] NHTSA reviewed industry recommendations concerning an implementation schedule for the revised Standard 121 and decided to adopt a schedule requiring that "truck tractors manufactured on or after March 1, 1997[,] . . . be equipped with ABS."[17] Consistent with this decision, NHTSA announced that the amendment would "become effective on March 1, 1997."[18] Standard 121 was thus amended to provide, in part, that "[e]ach truck tractor manufactured on or after March 1, 1997, shall be equipped with an antilock brake system."[19]

Duren points out that Standard 121 was not in effect when the truck was manufactured and argues that the absence of a standard cannot preempt state tort law proscribing the design and manufacture of dangerous and defective products. This is an overly broad interpretation of the law. More appropriately stated, a "federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left *un*regulated, and in that event would have as much preemptive [effect] as a decision *to* regulate."[20] Such is the case "where the failure of federal officials affirmatively to exercise their full authority takes on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute."[21]

This is not such a case. Under the federal preemption statute applicable to motor vehicle safety standards, Congress gave states at least limited authority to impose their own standards. The statute provides that

> [w]hen a motor vehicle safety standard *is in effect* under this chapter, a State or a political subdivision of a State may pre-

---

[13] Id.
[14] Id.
[15] See 58 FR 50738 (1993).
[16] See 60 FR 13216 (1995).
[17] Id. at 13252.
[18] Id. at 13216.
[19] 49 CFR § 571.121, S5.1.6.1 (b) (2001).
[20] (Punctuation omitted; emphasis in original.) *Lewis v. Brunswick Corp.*, 107 F3d 1494, 1502 (11th Cir. 1997) (quoting *Arkansas Elec. Cooperative Corp. v. Arkansas Public Svc. Comm.*, 461 U. S. 375, 384 (103 SC 1905, 1912, 76 LE2d 1) (1983)).
[21] (Punctuation omitted.) Id.

scribe or continue in effect a standard applicable to the same aspect of performance of a motor vehicle or motor vehicle equipment only if the standard is identical to the standard prescribed under this chapter.[22]

It is evident from a plain reading of this statute that, because the revised Standard 121 was not "in effect" when Paccar manufactured the truck in 1996, Congress and NHTSA intended to allow states to adopt their own braking standards for large trucks and, conversely, did not intend for the lack of an effective standard to preempt state tort law. Thus, until the effective date of the revised Standard 121, states would have been authorized to require manufacturers to install any of the various safety devices at issue, including ABSs, LSVs, or MLVs.

The United States Supreme Court *seemingly* construed the statute in this manner in *Freightliner Corp. v. Myrick*,[23] relied on by Duren and decided only five weeks after NHTSA published its final ruling requiring ABS installation. In *Myrick*, the Court ruled that because the preemption provision applies only when there is no express federal standard "in effect," and the only applicable standard had been suspended, the states were free to maintain their own safety standards.[24] The Court further ruled that the absence of a federal regulation did not itself constitute regulation which preempted state law.[25] This is because NHTSA did not affirmatively state that there should be no regulation; rather, the lack of a federal standard stemmed from the decision of the Ninth Circuit suspending the standard.[26]

Conspicuously absent from the Court's opinion, however, is any reference to NHTSA's recent ruling which effectively lifted the suspension on Standard 121. Indeed, the Court observed that "to this day [NHTSA] still has not taken final action to reinstate a safety standard governing the stopping distance of trucks and trailers."[27] Paccar attributes the omission to the fact that the Court was considering only the "pre-revision Standard 121." Alternatively, Paccar suggests that the Court "obviously was unaware" of the NHTSA ruling five weeks earlier.

It is unclear whether the Court in *Myrick* inadvertently over-

---

[22] (Emphasis supplied.) 49 USC § 30103 (b) (1) (2001) (formerly codified at 15 USC § 1392 (d)).

[23] 514 U. S. 280 (115 SC 1483, 131 LE2d 385) (1995).

[24] Id. at 286.

[25] See id.

[26] See id. at 287.

[27] Id. at 285-286.

looked the recently published amendment to Standard 121 or whether it considered the amendment irrelevant and therefore unworthy of discussion. It is clear, however, that unlike the truck at issue in the instant case, the trucks at issue in *Myrick* were manufactured several years before NHTSA even announced that it was revisiting the standard suspended by the Ninth Circuit.[28] Thus, the amended standard clearly would not have applied to those trucks.

In any event, as stated above, "[w]hether federal statutes or regulations preempt state law is 'a question of congressional intent.' "[29] Based on the plain language of the federal preemption statute, which expressly preempts state law only when a federal "safety standard is in effect," and NHTSA's equally clear ruling that the amendment "become[s] effective on March 1, 1997,"[30] Congress obviously did not intend to preempt state law until March 1, 1997.

Likewise, there is no evidence that Congress gave NHTSA exclusive authority to issue safety standards. Instead, the preemption statute clearly implies that states could impose safety standards on truck manufacturers until the federal government put a different standard "in effect." And, even where a safety regulation is "in effect," a savings clause enacted by Congress establishes that, under some circumstances, states are still authorized to impose stricter standards.[31] Because Standard 121 was not "in effect," we need not determine whether Congress intended the savings clause to have such significance in this case. For these reasons, we conclude that, under the regulatory scheme at issue, federal Standard 121 did not expressly preempt state tort law.

2. *Implied Preemption.*[32] Federal law may impliedly preempt state law where "state and federal law actually conflict, so that it is impossible to comply with both, or state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' "[33] In this case, Paccar argues that Duren's common law claim frustrates the purposes and objectives of NHTSA in promulgating the revisions to Standard 121 and that the standard therefore impliedly preempts Duren's state tort law claims.

Again, Duren relies on the Court's decision in *Myrick* to support the argument that Standard 121 does not impliedly preempt state

---

[28] See *Myrick v. Fruehauf Corp.*, 795 FSupp. 1139, 1140 (N.D. Ga. 1992).

[29] *Irving v. Mazda Motor Corp.*, 136 F3d 764, 767 (11th Cir. 1998).

[30] 60 FR 13216.

[31] See *Geier v. American Honda Motor Co.*, 529 U. S. 861 (120 SC 1913, 1918, 146 LE2d 914) (2000) (discussing savings clause codified at 49 USC § 30103 (e) (2001), formerly codified at 15 USC § 1397 (k)).

[32] We note that the savings clause referenced above "does *not* bar the ordinary working of conflict pre-emption principles." (Emphasis in original.) Id. at 869.

[33] *Lewis*, supra at 1500.

law. In *Myrick*, the Court ruled that the plaintiffs' lawsuits did not

> frustrate the accomplishment and execution of the full pur-
> poses and objectives of Congress. In the absence of a promul-
> gated safety standard, the Act simply fails to address the
> need for ABS devices at all. Further, Standard 121 currently
> has nothing to say concerning ABS devices one way or the
> other, and NHTSA has not ordered truck manufacturers to
> refrain from using ABS devices. A finding of liability against
> petitioners would undermine no federal objectives or pur-
> poses with respect to ABS devices, since none exist.[34]

It is questionable whether this reasoning applies here. As stated above, *Myrick* is distinguishable because the trucks at issue in that case were manufactured well before NHTSA even considered rein-stating the ABS requirement. Thus, it is quite possible that the Court considered the reinstated and revised standard irrelevant. Furthermore, although the effective date of the revised Standard 121 was delayed two years, NHTSA promulgated the standard requiring installation of ABSs in trucks approximately eighteen months prior to the date the truck at issue was manufactured. For these reasons, we agree with Paccar that *Myrick* is distinguishable and does not preclude a finding of implied preemption.

However, we disagree with Paccar's contention that the policy considerations justifying the delayed effective date of the ABS requirement would be frustrated by allowing Duren to maintain her state tort claims. Paccar analogizes this case to *Geier v. American Honda Motor Co.*,[35] where the United States Supreme Court recently considered the reasons underlying NHTSA's phased-in implementa-tion of an airbag safety requirement. In *Geier*, the plaintiff was injured in an automobile accident and sued Honda, the manufacturer of her automobile, because her car was not equipped with an airbag. An existing federal safety regulation required auto manufacturers to equip some, but not all, automobiles with airbags.[36] In considering whether to recognize a state common law claim that all automobiles should have airbags, the Court looked to the legislative history and intent underlying the standard. This history, the Court found, made it

> clear that the standard deliberately provided the manufac-
> turer with a range of choices among different passive

---

[34] (Citation and punctuation omitted.) *Myrick*, supra, 514 U. S. at 289-290.
[35] Supra; see note 32.
[36] Id. at 864-865 (discussing Federal Motor Vehicle Safety Standard 208).

restraint devices. Those choices would bring about a mix of different devices introduced gradually over time; and [the standard] would thereby lower costs, overcome technical safety problems, encourage technological development, and win widespread consumer acceptance — all of which would promote [the standard's] safety objectives.[37]

Paccar contends that the same reasoning should apply here. It cites to the legislative history in which NHTSA discussed the implementation schedule for the new ABS requirement and argues that NHTSA favored a phased-in implementation to decrease the compliance costs, reduce the burdens on manufacturers, and allow manufacturers more time to engineer quality ABS installations. According to Paccar, requiring truck manufacturers to install an ABS prior to the standard's effective date would frustrate the agency's accomplishment of these objectives.

The legislative history reveals that during the comment period, the trucking industry advocated a phased-in implementation of the ABS requirement over a four-year period ending in 1999. The trucking industry argued that this was necessary "to allow manufacturers the opportunity to offer a wider selection of ABS[,] . . . to provide time to improve existing systems[, and because] . . . a phase-in was essential to users because it would allow experimentation with different systems, thereby increasing public acceptance of the ABS mandate."[38] NHTSA, however, rejected this proposal, favoring instead a schedule that would provide "efficient implementation of Congress's desire that NHTSA require heavy vehicles to be equipped with ABSs. . . . Truck tractors, the vehicle type with the largest potential safety benefit from ABS, are required to comply with the rule first."[39] In rejecting the trucking industry's request for a phased-in schedule for heavy trucks, NHTSA emphasized that such a schedule "would have resulted in *needless* and protracted delay, thereby resulting in a significantly less safe highway environment."[40] Importantly, NHTSA found that

[s]uch a delay is unnecessary given the *current state of development* for ABS. At the time of publication of this final rule, six of the seven major U. S. manufacturers of heavy trucks . . . have publicly announced that some or all of their product line of truck tractors, and in some cases single-unit

---

[37] Id. at 875.
[38] 60 FR at 13252.
[39] Id.
[40] (Emphasis supplied.) Id.

trucks, will be equipped with ABS, as standard equipment, beginning with the 1995 model year. . . . Thus, it appears that the marketplace has already addressed [the industries'] concern that manufacturers cannot meet increasing market demand for ABS.[41]

Thus, it does not appear that Duren's state law claims frustrate the policy considerations raised by Paccar.

Paccar also argues that "[w]hen asked to clarify that states could not impose a retroactive mandatory requirement, through regulation or tort law, NHTSA responded by stating that states could only enforce a standard identical to the one promulgated by the Agency." We read NHTSA's response differently. NHTSA responded to the request for clarification by citing to the federal preemption statute, stating: "NHTSA notes that the statute (formerly known as the 'National Traffic and Motor Vehicle Safety Act of 1966') clearly addresses the issue of preemption at 49 USC [§] 30103 (b). That provision states that when a Federal motor vehicle safety standard is in effect, a State generally may only prescribe an identical standard."[42] Again, the effective date of the ABS requirement was March 1, 1997, six months after Paccar manufactured the truck at issue.

Finally, in support of its contention that Standard 121 impliedly preempts state law, Paccar cites a May 31, 1996 final ruling in which NHTSA made technical amendments to Standard 121.[43] That ruling, according to NHTSA, "substantially clarifies and simplifies this safety standard without changing any of its substantive requirements." As with the original ruling, the stated "effective" date was March 1, 1997, but under a section titled "Supplementary Information," NHTSA noted that "Standard No. 121 . . . will take mandatory effect on March 1, 1997, *with optional compliance for vehicles manufactured before that date.*"[44]

Though we agree with Paccar that this statement indicates that NHTSA intended to make compliance with Standard 121 temporarily optional, we disagree that this statement, standing alone, was intended to give the standard preemptive effect. We are unaware of any authority, and Paccar has cited none, which would require that an optional federal standard, that is not yet in effect, preempt state law. Furthermore, the intended purpose of the standard was to "reduce traffic accidents and deaths and injuries resulting from traf-

---

[41] (Emphasis supplied.) Id.
[42] 60 FR 63965, 63976 (1995).
[43] 61 FR 27288 (1996).
[44] (Emphasis supplied.) Id. at 27289.

fic accidents."[45] Considering this purpose, along with Congress's "desire that NHTSA require heavy vehicles to be equipped with ABSs,"[46] and NHTSA's finding that in light of existing technology any delay would have been "needless,"[47] a state law requiring such a safety device would not "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[48]

Accordingly, we conclude that Standard 121 does not expressly or impliedly preempt Georgia's tort law. The issue of whether Paccar's failure to include an ABS, a LSV, or a MLV rendered the truck defective is for a jury to resolve. Although compliance with federal standards or regulations is probative of Paccar's reasonableness under the risk-utility analysis, it is but "a piece of the evidentiary puzzle."[49] It follows that the trial court erred in granting Paccar's motion for summary judgment.

*Judgment reversed. Johnson, P. J., and Ellington, J., concur.*

DECIDED MAY 30, 2001 ▮▮▮▮▮▮

*Hicks, Casey & Barber, William T. Casey, Jr., Mark A. Barber, Mark W. Wortham, Buzzell, Graham & Welsh, Timothy K. Hall, Doffermyre, Shields, Canfield, Knowles & Devine, Foy R. Devine, David S. Hagy, Catherine Smith-Jones*, for appellant.

*Nelson, Mullins, Riley & Scarborough, Richard B. North, Jr., Donald L. Swift III*, for appellee.

*King & Spalding, Chilton D. Varner, Reynolds & McArthur, Charles M. Cork III*, amici curiae.

---

[45] 49 USC § 30101 (2001).
[46] 60 FR at 13252.
[47] Id.
[48] (Punctuation omitted.) *Lewis*, supra at 1500.
[49] *Doyle*, supra at 577.