IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 99-60382

STEVEN G. LADY,

Plaintiff-Appellant,

versus

NEAL GLASER MARINE, INC; ET AL,

Defendants,

OUTBOARD MARINE CORPORATION,
Doing Business As OMC, INC.,
doing business as OMCCC,
doing business as CHRIS CRAFT,

Defendant-Appellee.

Appeal from the United States District Court for the
Southern District of Mississippi

September 26, 2000

Before KING, Chief Judge, GARWOOD and DeMOSS, Circuit Judges.

GARWOOD, Circuit Judge:

Plaintiff-appellant Steven G. Lady (Lady) filed this suit in Mississippi state court against defendant-appellee Outboard Marine Corporation (OMC), seeking recovery for losses he sustained in a boating accident. OMC removed the case to federal court on the basis of diversity jurisdiction. Following removal, OMC filed a motion for summary judgment, arguing that the Federal Boat Safety Act, 46 U.S.C.

§§ 4301-4311 (FBSA), and Coast Guard regulatory action preempted Lady's state-law tort claims. By the consent of both parties, the action was referred to a Magistrate Judge for disposition. The Magistrate Judge granted OMC's motion for summary judgment. *Lady v. Outboard Marine Corp.*, 66 F. Supp.2d 818 (S.D. Miss. 1999). Lady now appeals. We affirm.

## Facts and Proceedings Below

On May 7, 1995, Lady was riding a personal water craft, commonly known as a "jet ski," in Bayou La Croix, in Hancock County, Mississippi. Richard Rychetsky (Rychetsky), one of Lady's friends, was operating a motor boat to the rear portside of Lady's vessel. The two vessels were traveling at approximately thirty to thirty-five miles per hour within twenty feet of one another when Rychetsky blew his boat's horn. Lady reacted to the horn by making a hard left turn, placing his jet ski directly into the path of Rychetsky's boat. The vessels collided, causing Lady to be thrown off of his jet ski and under Rychetsky's boat. While in the water, Lady came into contact with the boat's moving propeller, resulting in severe injuries to Lady including lacerations to his head, the loss of one leg, and injury to the other.

On February 18, 1998, Lady filed this action in Mississippi state court against OMC, the manufacturer of Rychetsky's boat, and Neal Glaser Marine, Inc., the distributor of the boat, seeking recovery under Mississippi tort law for the injuries and losses he sustained as a

2

result of the May 7, 1995 boating accident on Bayou La Croix.[1]  Lady alleged that OMC and Neal Glaser Marine were liable under Mississippi law for negligence, breach of warranty, gross negligence, and design defect for failing to equip Rychetsky's boat with a propeller guard.[2]  On April 7, 1998, OMC removed the action to federal court on the basis of diversity jurisdiction.  Lady later voluntarily dismissed his claims against Neal Glaser Marine.

Following removal, the case was placed on inactive status, pending the outcome of *Lewis v. Brunswick Corp.*, 107 F.3d 1494 (11th Cir. 1997), *cert. granted*, 118 S.Ct. 439 (1998), in which the Supreme Court granted certiorari to consider the preemptive effect of the FBSA and Coast Guard regulations on an action similar to Lady's.  After the Supreme Court heard oral argument in *Lewis* but before the Court issued a decision, the parties in *Lewis* settled and the Court dismissed the petition for certiorari.  *See Lewis v. Brunswick Corp.*, 118 S.Ct. 1793 (1998). Following the Supreme Court's dismissal, Lady's action was removed from inactive status.   On September 9, 1998, OMC moved for summary judgment, arguing that federal law preempted Lady's claims against OMC—the same issue before the Court in *Lewis*.  One month later, Lady and OMC consented to a Magistrate Judge's conducting all proceedings in the action, including the entry of final judgment.  After a hearing on OMC's

---

[1]  In a separate action, Lady settled his claims against Rychetsky.

[2]  Lady's pleadings also alleged that the boat's throttle was defective; however, Lady later voluntarily dismissed this claim.

motion for summary judgment, the Magistrate Judge granted the motion, concluding that the FBSA and Coast Guard regulatory decisions preempted Lady's claims. Lady timely appealed.

## Discussion

We review a judgment rendered by a Magistrate Judge[3] just as we would a judgment rendered by a district court. *See Madison v. Parker*, 104 F.3d 765, 767 (5th Cir. 1997). We review a grant of summary judgment applying the same standard as the court below was required to apply. *See Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 725 (5th Cir. 1995). Summary judgment must be affirmed when the non-moving party, in this case, Lady, has failed to demonstrate that a material issue of fact is present. *See Madison*, 104 F.3d at 767. Summary judgment evidence is viewed in the light most favorable to the nonmovant, and questions of law are reviewed *de novo*. *See id*. The Magistrate Judge's ruling that federal law preempts Lady's claims is a legal determination that this Court reviews *de novo*. *See Baker v. Farmers Elec. Coop., Inc.*, 34 F.3d 274, 278 (5th Cir. 1994). We may affirm the summary judgment on any basis raised below and supported by the record. *See Davis v. Scott*, 157 F.3d 1003, 1005 (5th Cir. 1998); *Davis v. Liberty Mut. Ins. Co.*, 525 F.2d 1204, 1207 (5th Cir. 1976); *see also* 10A CHARLES ALAN WRIGHT ET AL.,

---

[3] OMC and Lady executed written consent to proceed before the Magistrate Judge, pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. In accordance with 28 U.S.C. § 636(c)(3), this Court is the appropriate forum for appellate review of the final judgment entered by the Magistrate Judge. *See Oliver v. Collins*, 904 F.2d 278, 279-80 (5th Cir. 1990).

4

FEDERAL PRACTICE AND PROCEDURE § 2716, at 290 (3d ed. 1998).

I    Preemption by the FBSA and Coast Guard Regulation

Federal law generally preempts state law under the Supremacy Clause whenever (1) Congress has expressly preempted state action, (2) Congress has installed a sufficiently comprehensive regulatory scheme in the area, thus removing the entire field from state realm, or (3) state action would directly conflict with the force or purpose of federal law. *See Cipollone v. Liggett Group*, 112 S.Ct. 2608, 2617 (1992); *English v. General Elec. Co.*, 110 S.Ct. 2270, 2275 (1990); *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 335 n.1 (5th Cir. 1995) (*en banc*). As neither party suggests that the second type of preemption–field preemption–applies, we need only address express and implied conflict preemption.

Whether federal law preempts Lady's state common-law tort claims is an issue of first impression in this Court. Several other courts, both state and federal, have considered the issue. However, they have not reached a uniform conclusion. *See generally* Amy P. Chiang, Note, *The Federal Boat Safety Act of 1971 and Propeller Strike Injuries: An Unexpected Exercise in Federal Preemption*, 68 FORDHAM L. REV. 487 (1999). Nine courts have held that express preemption applies. *See Carstensen v. Brunswick Corp.*, 49 F.3d 430, 431-32 (8th Cir. 1995); *Moss v. Outboard Marine Corp.*, 915 F. Supp. 183, 186 (E.D. Cal. 1996); *Davis v. Brunswick Corp.*, 854 F. Supp. 1574, 1580 (N.D. Ga. 1994); *Shield v. Bayliner Marine Corp.*, 822 F. Supp. 81, 83 (D. Conn. 1993); *Shields v.*

*Outboard Marine Corp.*, 776 F. Supp. 1579, 1581 (M.D. Ga. 1991); *Mowrey v. Mercury Marine, Div. of Brunswick Corp.*, 773 F. Supp. 1012, 1016–17 (N.D. Ohio 1991); *Ryan v. Brunswick Corp.*, 557 N.W.2d 541, 548–49 (Mich. 1997); *Sprietsma v. Mercury Marine*, 729 N.E.2d 45, 52–53 (Ill. App. Ct. 2000); *Farner v. Brunswick Corp.*, 607 N.E.2d 562, 567–68 (Ill. App. Ct. 1993). Three courts have found implied preemption. *See Lewis*, 107 F.3d at 1505–06; *Davis*, 854 F. Supp. at 1581–82; *Shields*, 776 F. Supp. at 1582. Two courts have concluded that federal law does not preempt state law in this context. *See Moore v. Brunswick Bowling & Billiards Corp.*, 889 S.W.2d 246, 250–51 (Tex.), *cert. denied sub. nom.*, 115 S.Ct. 664 (1994); *Ard v. Jensen*, 996 S.W.2d 594, 599–600 (Mo. Ct. App. 1999).

Lady argues that the Magistrate Judge erred in ruling that federal law preempts his Mississippi common-law tort claims against OMC. He contends that, despite the FBSA's express preemption clause, contained in 46 U.S.C. § 4306, and the Coast Guard's regulatory decisions, his action against OMC is not precluded because preemption under section 4306 does not extend to his common-law tort claims and because the FBSA's savings clause, 46 U.S.C. § 4311(g), preserves his action. OMC responds that section 4306 and the Coast Guard's regulatory decisions both expressly and impliedly preempt Lady's common-law tort claims, because subjecting OMC to a damage award would result in varying state requirements for recreational vessels, in direct contravention to Congress's intent to establish uniform requirements for recreational vessels. We now weigh in on this close and difficult issue and conclude

6

that, although the FBSA and the Coast Guard's regulatory decisions do not expressly preempt Lady's tort claims, implied conflict preemption does preclude his action against OMC, because a state rule requiring propeller guards on recreational vessels would frustrate the Coast Guard's decision that recreational boats should not be required to be equipped with propeller guards.

A    The FBSA and Coast Guard Regulatory Decisions

Congress enacted the FBSA in 1971, in part, "to improve boating safety by requiring manufacturers to provide safer boats and boating equipment to the public through compliance with safety standards to be promulgated by the Secretary of the Department in which the Coast Guard is operating–presently the Secretary of Transportation." S. REP. NO. 92-248 (1971), *reprinted in* 1971 U.S.C.C.A.N. 1333, 1333. A significant increase in the number of recreational boaters in the United States and in the number of boating "accidents, deaths and injuries," *id*. at 1334, required "a coordinated national boating safety program." *Id*. at 1335. To implement this goal, the FBSA authorizes the Secretary of Transportation (the Secretary) to prescribe regulations establishing minimum safety standards for recreational boats. *See* 46 U.S.C. § 4302[4].

_____

[4]  46 U.S.C. § 4302 provides:
"(a) The Secretary may prescribe regulations–
(1) establishing minimum safety standards for recreational vessels and associated equipment, and establishing procedures and tests to measure conformance with those standards, with each standard–
(A) meeting the need for recreational vessel safety; and
(B) being stated, insofar as practicable, in

terms of performance;
    (2) requiring the installation, carrying, or use of associated equipment (including fuel systems, ventilation systems, electrical systems, sound-producing devices, firefighting equipment, lifesaving devices, signaling devices, ground tackle, life- and grab-rails, and navigational equipment) on recreational vessels and classes of recreational vessels subject to this chapter, and prohibiting the installation, carrying, or use of associated equipment that does not conform with safety standards established under this section; and
    (3) requiring or permitting the display of seals, labels, plates, insignia, or other devices for certifying or evidencing compliance with safety regulations and standards of the United States Government for recreational vessels and associated equipment.
(b) Each regulation prescribed under this section shall specify an effective date that is not earlier than 180 days from the date the regulation was published, unless the Secretary finds that there exists a recreational vessel safety hazard so critical as to require an earlier effective date. However, this period may not be more than 24 months for cases involving, in the discretion of the Secretary, major product design, retooling, or major changes in the manufacturing process.
(c) In prescribing regulations under this section, the Secretary shall, among other things-
    (1) consider the need for and the extent to which the regulations will contribute to recreational vessel safety;
    (2) consider relevant available recreational vessel safety standards, statistics, and data, including public and private research, development, testing, and evaluation;
    (3) not compel substantial alteration of a recreational vessel or item of associated equipment that is in existence, or the construction or manufacture of which is begun before the effective date of the regulation, but subject to that limitation may require compliance or performance, to avoid a substantial risk of personal injury to the public, that the Secretary considers appropriate in relation to the degree of hazard that the compliance will correct; and
    (4) consult with the National Boating Safety Advisory Council established under section 13110 of

8

The Secretary has the option to delegate regulatory functions to a designated agency that then operates under the Secretary's supervision. *See* 46 U.S.C. § 4303(a)[5]. The Secretary exercised that option and delegated to the Commandant of the United States Coast Guard the duty of "[c]arry[ing] out the functions vested in the Secretary by the . . . Federal Boat Safety Act of 1971 . . .." 49 C.F.R. § 1.46(n)(1).

Immediately after the FBSA took effect, the Secretary began implementing a federal scheme of recreational boat safety regulations. In the initial period of transition from a primarily state law regime to a federal one, the Secretary, pursuant to 46 U.S.C. § 4305[6], exempted

this title about the considerations referred to in clauses (1)-(3) of this subsection.

(d) Section 8903 of this title does not apply to a vessel being operated for bona fide dealer demonstrations provided without fee to business invitees. However, if on the basis of substantial evidence, the Secretary decides under this section that requiring vessels so operated to be under the control of licensed individuals is necessary for boating safety, then the Secretary may prescribe regulations requiring the licensing of individuals controlling these vessels in the same manner as provided in chapter 89 of this title for individuals in control of vessels carrying passengers for hire."

[5]  46 U.S.C. § 4303(a) states:
    "Subject to regulations, supervision, and reviews that the Secretary may prescribe, the Secretary may delegate to a person, private or public agency, or organization, or to an office or employee under the supervision of that person or agency, any work, business, or function related to the testing, inspection and examination necessary for compliance enforcement and for the development of data to enable the Secretary to prescribe regulations under section 4302 of this title."

[6]  46 U.S.C. § 4305 provides that "[i]f the Secretary considers that recreational vessel safety will not be adversely affected, the Secretary may issue an exemption from this chapter or a regulation

all state boat safety laws "in effect on the effective date of the [FBSA]" from preemption under 46 U.S.C. § 4306.  36 Fed. Reg. 15764-65 (1971).  Approximately one year later, the Coast Guard issued a set of federal regulations governing recreational boat design and performance. *See* 37 Fed. Reg. 15776-85 (1972).  These regulations cover a broad spectrum, including personal flotation devices, flotation requirements, and ventilation, fuel, and electrical systems. *See generally* 33 C.F.R., subch. S.  Thereafter, the Coast Guard replaced the blanket exemption from preemption of state boat safety law with a more limited one not at issue in this appeal.  *See* 38 Fed. Reg. 6914-15 (1973).

Before promulgating a regulation, the Coast Guard is required to consult with the National Boating Safety Advisory Council (the Advisory Council)[7] on the need for regulation.  *See* 46 U.S.C. § 4302(c)(4).  In 1988, the Coast Guard directed the Advisory Council to examine the

---

prescribed under this chapter."

[7] The Advisory Council is a twenty-one member council, consisting of three groups of seven members.  Each member of the council is appointed by the Secretary and is considered to have "particular expertise, knowledge, and experience in recreational boating safety." 46 U.S.C. § 13110(a).  Section 13110(b) specifies the composition of the Advisory Council as follows:
> "(b)(1) The membership of the Council shall consist of—
>     (A)  7  representatives  of  State  officials responsible for State boating safety programs;
>     (B) 7 representatives of recreational vessel manufacturers and associated equipment manufacturers; and
>     (C) 7 representatives of national recreational boating organizations and from the general public, at least 5 of who shall be representatives of national recreational boating organizations."  46 U.S.C. § 13110(b).

10

feasibility and potential safety advantages and disadvantages of propeller guards on recreational boats and to consider whether requirements mandating propeller guards in the design and manufacture of recreational boats were appropriate.  The Advisory Council then appointed a Propeller Guard Subcommittee (the Subcommittee) "to consider, review and assess available data concerning the nature and incidence of recreational boating accidents in which persons in the water are struck by propellers."  National Boating Safety Advisory Board, Report of the Propeller Guard Subcommittee 1 (1989).  The Advisory Council also asked the Subcommittee to consider, *inter alia*, whether "the Coast Guard [should] move towards a federal requirement for some form of propeller guard."  *Id*. at app. A.[8]

_____

[8]  The Advisory Council's charge to the Subcommittee reads in full:
"* Review the available data on the prevention of propeller-strike accidents and the Coast Guard study of various methods of shrouding propellers to prevent contact with a person in the water.
    * Assess the arguments for and against some form of mechanical guard to protect against propeller strikes reflecting the positions of state boating law administrators, the recreational boating industry, and the boating public.
    * Among points to be considered:
  a. what is the incidence of such accidents?
  b. is there a trend toward more or fewer such accidents?
  c. what are the possible solutions and their advantages/disadvantages?
  d. how is this problem being addressed in other nations?
  e. what would be the direct costs and indirect costs (fuel economy, maintenance, etc.) of mechanical solutions?
  f. can the risks be addressed by education?
  g. should the Coast Guard move towards a federal requirement for some form of

Over a one-year period, the Subcommittee reviewed material provided by the Coast Guard and held hearings on three occasions, receiving information from a variety of individuals and groups interested in the topic of propeller guards. *See id*. at 1-3. One of the issues on which the Subcommittee received information was propeller guard litigation, and the Subcommittee devoted a section of its report to the topic. *See id*. at 4-6. The report details the legal theories of liability asserted against boat manufacturers by propeller strike victims, including the failure to equip boats with propeller guards, and the defenses raised by the manufacturers. *See id*. at 4-5. In this section, the Subcommittee notes that, at the time of the hearings, the advocates for propeller guards were "petition[ing] federal and state legislators and regulators to mandate propeller guards." *Id*. at 5. The Subcommittee's report further states that "[s]uch [a] mandate would necessarily be predicated on the feasibility of guards and establish prima facie manufacturer liability in having failed to provide them." *Id*.

---

propeller guard?

h. assess the potential for propeller equipped with each of several propeller guard designs to cause injury. How much has the propeller guard reduced the injury potential compared to the injury potential of the same propeller operating in an unguarded manner?

i. should only new boats and motors be equipped with propeller guards, or should all boats eventually be equipped with a guard?

j. what is the practical boat length limit beyond which propeller guards would not be required? [A]re there other parameters which would dictate upper limits for guard installation?" *Id*.

12

Therefore, the Subcommittee considered feasibility as an important issue. *See id*. Manufacturers, however, remained "opposed to mandatory propeller guards." *Id.* at 6.

The report later addresses the technical issues posed by propeller guards[9]. *See id*. at 12-19. The Subcommittee found that, while propeller guards were "feasible at idling and very low speeds," *id*. at 20, they adversely affected boat operation at speeds greater than ten miles per hour, "requir[ing] greatly increased power and fuel consumption to regain the lost speed." *Id*. at 21.[10] In addition, the

---

[9] The report notes that, although numerous variations of propeller guards have been developed, they essentially take one of three configurations: (1) a ring band guard; (2) a mask guard; and (3) the Kort nozzle. *See id*. at 12-13. A ring band guard consists of a shell "secured to the submerged portion of an outboard motor or stern drive unit and within which the propeller revolves." *Id*. at 12. A mask guard involves "surrounding the propeller like a fan cage or catcher's mask, constructed of wire mesh, bars or wires." *Id*. at 13. A Kort nozzle, used mainly on tug boats and large vessels, shrouds the propeller in a tunnel or tube and with the installation of vanes can direct the flow of water and prevent the entry of body parts. *See id*. at 13, 15. The Subcommittee examined ring band and mask guards, but not nozzle guards, as none suitable for recreational vessels was brought to the attention of the Subcommittee. *See id*. at 15. Moreover, "[n]o guard device suitable for inboard engine drive propellers on displacement or planing motor boats, or on auxiliary sail boats was presented." *Id*. A concern raised with regard to installing the ring band and mask guards was an increase in "the total area of a possible underwater impact." *Id*. at 13.

[10] The Subcommittee's report also states that:
"[B]oats and motors should be designed to incorporate technologically feasible safety features to avoid or minimize the consequences of inexperienced or negligent operation, without at the same time (a) creating some other hazard, (b) materially interfering with normal operations, or (c) being at economic costs disproportionate to the particular risk.
Proponents [of propeller guards] assert that propeller guard technology and/or availability meets the foregoing

13

Subcommittee determined that propeller guards would not necessarily

increase overall boating safety, because they would increase the chance

of contact between a blunt object (the propeller guard) and a person in

the water, thereby substituting a decreased chance of a propeller strike

injury for an increase in the likelihood of a blunt trauma injury. *See*

*id*. at 19-21.[11] Therefore, the Subcommittee recommended unanimously that

---

criteria and that guards should be mandated. The Subcommittee does not agree . . ..” *Id*. at 20.

[11] The Subcommittee noted that:

"Injuries/fatalities caused by underwater impacts result from a person coming into contact with the propeller or any part of the propulsion unit (i.e., lower unit, skeg, torpedo, anti-ventilation plate, etc.) and even the boat itself. Currently reported accidents make it obvious that all such components are involved in the total picture, and that the propeller itself is the sole factor in only a minority of impacts. The development and use of devices such as 'propeller guards' can, therefore, be counter-productive and create new hazards of equal or greater consequence. [] Operator error is clearly a significant factor in the vast majority of underwater impacts which result in injuries/fatalities. Mandatory equipment requirements could be expected to have only a negligible impact on this problem. The most rational approach to the problem is to educate boaters, especially operators. They must be made to understand the abilities and limitations of their equipment. They must be aware of and understand the hazards their boat can cause to people in the water. Above all, they must be made to understand the consequences of careless or negligent operation of their watercraft, and how they, as boat operators, can act to prevent accidents. [] Although the controversy which currently surrounds the issue of propeller guarding is, by its very nature, highly emotional and has attracted a great deal of publicity, there are no indications that there is a generic or universal solution currently available or foreseeable in the future. The boating public must not be misled into thinking there is a 'safe' device which would eliminate or significantly reduce such injuries or fatalities." *Id*. at 23-24.

14

"[t]he U.S. Coast Guard should take no regulatory action to require propeller guards." *Id*. at 24.

The Subcommittee's Chairman, Captain James E. Getz, presented the report to the entire Advisory Council, which unanimously "accept[ed] the report, adopt[ed] the recommendations of the subcommittee, and discharge[d] the subcommittee as having completed its task." Minutes of the 44th Meeting of the National Boating Advisory Council 19 (Nov. 6-7, 1989). The Advisory Council then forwarded the report and recommendations to the Coast Guard. On February 1, 1990, the Coast Guard informed the Advisory Council that it had adopted each of the Advisory Council's recommendations. *See* Letter from Robert T. Nelson, Rear Admiral, U.S. Coast Guard, Chief, Office of Navigation Safety and Waterway Services, to A. Newell Garden, Chairman, National Boating Safety Advisory Council (Feb. 1, 1990). The letter explains the Coast Guard's position on propeller guards as follows:

> "The regulatory process is very structured and stringent regarding justification. Available propeller guard accident data do not support imposition of a regulation requiring propeller guards on motorboats. Regulatory action is also limited by the many questions about whether a universally acceptable propeller guard is available or technically feasible in all modes of boat operation. Additionally, the question of retrofitting millions of boats would certainly be a major economic consideration.
> The Coast Guard will continue to collect and analyze data for changes and trends; and will promote increase/improved reporting as addressed in recommendation 2. The Coast Guard will also review and retain any information made available regarding development and testing of new propeller guarding devices or other information on the state of the art." *Id*. at 1.

Accordingly, the Coast Guard decided not to implement regulations

15

requiring propeller guards on recreational boats.[12] Neither, however, has the Coast Guard forbidden the installation of propeller guards. It is against this backdrop of Coast Guard decision making that we consider Lady's claims against OMC.

B      Presumptions Regarding Preemption

At the outset, the parties dispute the here important question of whether our analysis should begin with a presumption that federal law does not preempt Lady's common-law tort claims against OMC. Lady contends that, in areas traditionally regulated by states through their police powers, a presumption that federal law does not supercede such powers arises. Lady concludes that, because his claims primarily concern safety and health, the presumption against preemption applies in this case. Conversely, OMC asserts that Lady's action also bears upon general maritime law, which is primarily of federal concern, and therefore a presumption against preemption is not warranted in this

---

[12]  The Coast Guard has continued to study various proposals to prevent propeller-related injuries. In 1995, the Coast Guard issued an Advance Notice of Proposed Rulemaking (ANPRM) requesting comment on "the public's present feelings about the use of propeller guards . . . on these vessels." 60 Fed. Reg. 25191 (1995). In 1996, the Coast Guard issued an ANPRM "to gather current, specific, and accurate information about the injuries involving propeller strikes and rented boats." 61 Fed. Reg. 13123 (1996). And, in 1997, the Coast Guard requested "comments on the effectiveness of specific devices and interventions which have been suggested for reducing the number of recreational boating accidents involving rented power boats in which individuals are injured by the propeller." 62 Fed. Reg. 22991 (1997). Because this request received so few responses, the Coast Guard extended the period for comments. *See* 62 Fed. Reg. 44507 (1997). To date, the rulemaking remains open, and the Coast Guard is still considering what action, if any, to take regarding propeller guards. *See* 64 Fed. Reg. 21566 (1999).

16

context.  To be sure, Lady's tort action touches on safety and health–"matters that historically have been areas of state jurisdiction." *MacDonald v. Monsanto Co.*, 27 F.3d 1021, 1023 (5th Cir. 1994) (citing *Hillsborough County v. Automated Medical Labs., Inc.*, 105 S.Ct. 2371, 2376 (1985)); *see Medtronic, Inc. v. Lohr*, 116 S.Ct. 2240, 2250 (1996).  However, in *United States v. Locke*, 120 S.Ct. 1135 (2000), the Supreme Court made clear that "an 'assumption' of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence."  *Id*. at 1147 (citations omitted).  *Locke* considered whether federal law preempted a series of regulations enacted by the State of Washington in response to the Exxon Valdez oil spill; these regulations addressed, *inter alia*, oil tanker operations and design, as well as crew training and qualifications, and were established "to provide 'the best achievable protection . . . from damages caused by the discharge of oil.'"  *Id.* at 1142 (quoting WASH. REV. CODE § 88.46.040(3) (1994)).  Although these tanker standards were promulgated to preserve the health and safety of Washington's population and property, the Court nevertheless concluded that, because Washington's regulations "b[ore] upon national and international maritime commerce, . . . in this area there [wa]s no beginning assumption that concurrent regulation by the State is a valid exercise of its police powers."  *Id*. at 1148.

Similarly, Lady's action, which alleges that OMC designed a defective boat by failing to include a propeller guard, relates not only

17

to health and safety, but also to maritime activity–an area traditionally within the purview of federal regulation. *See Southern Pac. Co. v. Jensen*, 37 S.Ct. 524, 528 (1917) ("Congress has paramount power to fix and determine the maritime law which shall prevail throughout the country.") (citations omitted); *see also Locke*, 120 S.Ct. at 1148 ("Congress has legislated in the [area of maritime commerce] from the earliest days of the Republic, creating an extensive federal statutory and regulatory scheme."); *Kelly v. Washington*, 58 S.Ct. 87, 89 (1937) ("The federal acts and regulations with respect to vessels on the navigable waters of the United States are elaborate."); *Mallard Bay Drilling, Inc. v. Herman*, 212 F.3d 898, 900-02 (5th Cir. 2000) (holding that the Coast Guard had sole jurisdiction, to the exclusion of OSHA, over the working conditions of seamen on barges in a navigable waterway within a state's territorial waters); *Exxon Corp. v. Chick Kam Choo*, 817 F.2d 307, 316-18 (5th Cir. 1987), *rev'd on other grounds*, 108 S.Ct. 1684 (1988); *cf. Consolidated Cigar Corp. v. Reilly*, ___ F.3d ____, 2000 WL 960526, at * 3 (1st Cir. July 17, 2000) (deciding that a presumption against preemption does arise when considering state regulations on the sale, promotion, and labeling of tobacco products, by contrasting federal involvement in tobacco products with that in maritime activity). Admittedly, Lady's claims do not involve a tanker engaged in maritime commerce. However, the Court in *Foremost Insurance Co. v. Richardson*, 102 S.Ct. 2654 (1982), held that a collision between two pleasure craft on navigable waters had a sufficient nexus to traditional maritime

18

activity to fall within the admiralty jurisdiction of the federal courts[13]. *See id*. at 2658-59. Accordingly, any distinction between recreational vessels and tankers is of little significance, as the national interest in vessels operating on navigable waters of the United States encompasses both. *See id*. at 2659.

The FBSA and the regulations prescribed pursuant to the FBSA "appl[y] to a recreational vehicle and associated equipment carried in the vessel on waters subject to the jurisdiction of the United States . . . and, for a vessel owned in the United States, on the high seas." 46 U.S.C. § 4301(a); *see* S. REP. NO. 92-248 (1971), *reprinted in* 1971 U.S.C.C.A.N. 1333, 1338 ("General jurisdictional applicability [of the FBSA] is to vessels within the historic federal maritime jurisdiction–the navigable waters of the United States, certain internal waters which are in the exclusive or concurrent jurisdiction of the United States, and extraterritorial applicability to vessels owned in the United States."). Lady does not argue that Rychetsky's boat was not a "recreational vehicle" or a vessel, nor does Lady contend that the waterway where the boating accident occurred, Bayou La Croix, is not a navigable water "subject to the jurisdiction of the United States." 46 U.S.C. § 4301(a). Therefore, the design and manufacture of Rychetsky's boat is subject to the FBSA and the regulatory decisions promulgated under the FBSA. Because a state common-law rule requiring OMC to equip

---

[13] "The judicial Power [of the United States] shall extend . . . to all Cases of admiralty and maritime Jurisdiction . . . .." U.S. CONST. art. III, § 2.

19

its boats with propeller guards implicates federal concerns at least as much state concerns, we cannot say that the state's interests predominate. Therefore, in this area where the proposed state rule at issue bears upon an area traditionally regulated by the federal government, a presumption against preemption does not guide our analysis of whether federal law precludes Lady's common-law tort claims against OMC. *See Locke*, 120 S.Ct. at 1147-48; *see also CSX Transp., Inc. v. City of Plymouth*, 92 F. Supp.2d 643, 648-49 (E.D. Mich. 2000) (holding, under *Locke*'s principles, that, given Congress's well-established power to regulate the railroad industry, a presumption against preemption does not arise in deciding whether a state statute was preempted by the Federal Railway Safety Act).

C    Express Preemption

We now address whether the FBSA and the Coast Guard's regulations expressly preempt Lady's state common-law tort action against OMC. OMC contends that Lady's claims fall within the reach of the FBSA's express preemption clause, which provides:

> "Unless permitted by the Secretary under section 4305 of this title, a State or political subdivision of a State may not establish, continue in effect, or enforce a law or regulation establishing a recreational vessel or associated equipment performance or other safety standard or imposing a requirement for associated equipment (except insofar as the State or political subdivision may, in the absence of the Secretary's disapproval, regulate the carrying or use of marine safety articles to meet uniquely hazardous conditions or circumstances within the State) that is not identical to a regulation prescribed under section 4302 of this title."

20

46 U.S.C. § 4306.[14]

In OMC's view, the Coast Guard's 1990 decision not to require propeller guards constitutes a "regulation prescribed under section 4302," which preempts state laws or regulations. OMC contends that Lady's action, if successful, would result in a state common-law regulation requiring propeller guards on recreational boats, which would not be identical to and would actually conflict with the Coast Guard's decision that propeller guards should not be required. Thus, OMC concludes that Lady's claims are preempted by section 4306.

Lady responds that the section 4306's phrase "law or regulation"

---

[14] The legislative history explains the preemption clause as follows:

"This section [46 U.S.C. § 4306] provides for federal preemption in the issuance of boat and equipment safety standards. This conforms to the long history of preemption in maritime safety matters and is founded on the need for uniformity applicable to vessels moving in interstate commerce. In this case it also assures that manufacture for the domestic trade will not involve compliance with widely varying local requirements. At the same time, it was recognized that there may be serious hazards which are unique to a particular locale and which would justify variances at least with regard to the carriage or use of marine safety articles on boats. Therefore, the section does permit individual States to impose requirements with respect to carrying or using marine safety articles which go beyond the federal requirements when necessary to meet uniquely hazardous local conditions or circumstances. A right of disapproval, however, is reserved to the Secretary to insure that indiscriminate use of state authority does not seriously impinge on the basic need for uniformity.
The section does not preempt state law or regulation directed at safe boat operation and use, which was felt to be appropriately within the purview of state or local concern." S. REP. NO. 92-248 (1971), reprinted in 1971 U.S.C.C.A.N. 1333, 1341.

21

does not include the common law, because section 4306 makes no mention of "common law," and thus refers only to positive enactments of law at the state or local level. Accordingly, Lady concludes that Congress's failure to specify "common law" in section 4306 evinces an intent not to preempt common-law claims such as his. Moreover, Lady contends that the FBSA's savings clause, 46 U.S.C. § 4311(g)[15], preserves his claims against OMC, despite the preemption clause and regulatory decisions concerning recreational vessels.

In determining the scope of preemption under section 4306, we focus on the purpose of Congress. *See Medtronic,* 116 S.Ct. at 2250 (citations omitted). Congressional intent is revealed primarily through the text of the preemption statute and the statutory framework surrounding it. *See id*. at 2250-51 (citation omitted); *see also CSX Transp., Inc. v. Easterwood*, 113 S.Ct. 1732, 1737 (1993) ("If the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent."). "Also relevant, however, is the 'structure and purpose of the statute as a whole,' as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Medtronic*, 116

---

[15] 46 U.S.C. § 4311(g) states that "[c]ompliance with this chapter or standard, regulations, or orders prescribed under this chapter does not relieve a person from liability at common law or under State law."

22

S.Ct. at 2251. By its terms, section 4306 preempts state laws or regulations that are not identical to regulations promulgated under the FBSA, unless exempted from by preemption by the Secretary under 46 U.S.C. § 4305 or directed to remedy uniquely local dangers (subject to the Secretary's disapproval). Because the FBSA does not define the section 4306's phrase "law or regulation", we now consider whether it includes state common-law tort claims.

Although section 4306 does not specifically enumerate "common law" as being preempted, the Supreme Court, in other contexts, has interpreted language similar to section 4306's to include state common-law tort actions. *See, e.g., Medtronic*, 116 S.Ct. at 2260 (considering the term "requirement" in the Medical Devices Act, 21 U.S.C. § 360k(a)) (Breyer, J., concurring in part and concurring in judgment); *id*. at 2263 (same) (O'Connor, J., joined by Rehnquist, C.J., and Scalia, and Thomas, JJ., concurring in part and dissenting in part) (same); *Morales v. Trans World Airlines, Inc*. 112 S.Ct. 2031, 2039 (1992) (concluding that a state common-law claim counts as "any law, rule, regulation, standard, or other provision having the force and effect of law" for purposes of the Airline Deregulation Act); *Cipollone*, 112 S.Ct. at 2620 (holding that "requirements or prohibitions . . . under State law," contained in the Public Health Cigarette Smoking Act of 1969, made no distinction between positive legal enactments and the common law) (plurality opinion); *id*. at 2634 (same) (Scalia, J., joined by Thomas, J., concurring in judgment in part and dissenting in part); *CSX Transp.*, 113

S.Ct. at 1737 (interpreting the phrase "state 'law, rule, regulation, order, or standard relating to railroad safety'") (quoting 45 U.S.C. § 434); *see also MacDonald*, 27 F.3d at 1025 ("The MacDonalds argue, however, that state common law judgments are not 'requirements': the liable party is not 'required' to change his label by a damage award, the argument goes, but may simply pay the judgment and leave the label as it is. We think this argument is sophistry."). This past term, the Court, in *Geier v. American Honda Motor Co., Inc.*, 120 S.Ct. 1913 (2000), considered whether the Motor Vehicle Safety Act's express preemption provision[16] preempted a state tort action based on the failure to equip an automobile with a driver's side airbag. *See id*. at 1918. Although acknowledging that the term "requirement" included common-law tort actions in *Medtronic*, the Court stated that "[w]e need not determine the precise significance of the use of the word 'standard,' rather than 'requirement,' . . . for the [Motor Vehicle Safety] Act contains another provision, which resolves the disagreement." *Id*. This provision, a savings clause[17], "assumes that there are some significant

_____

[16]    The provision at issue in *Geier* reads as follows:
        "Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment[,] any safety standard applicable to the same aspect of such vehicle or item of equipment which is not identical to the Federal standard."   15 U.S.C. § 1392(d).

[17]    The Motor Vehicle Safety Act's savings clause provides that "[c]ompliance with" a federal motor vehicle safety standard "does not exempt any person from any liability under common law."  15 U.S.C. §

24

number of common-law liability cases to save." *Id*. In order to give effect to the savings clause, the Court interpreted "standard" so as to exclude common-law tort actions. *See id*. Otherwise, under a "broad reading of the pre-emption clause little, if any, potential 'liability at common law' would remain[,] [a]nd few, if any, state tort actions would remain for the saving clause to save." *Id.; see United Airlines, Inc. v. Mesa Airlines, Inc.*, ___ F.3d ____, 2000 WL 898694, at *2 (7th Cir. July 5, 2000) ("A broad clause saving common-law remedies might overcome the understanding that judgments in tort suits should be treated like state laws and regulations to the extent that they have the same practical effect as laws and regulations . . ..") (citations omitted).

Similar to the Motor Vehicle Safety Act, the FBSA also contains a savings clause, which provides that "[c]ompliance with this chapter or standards, regulations, or orders prescribed under this chapter does not relieve a person from liability at common law or under State law." 46 U.S.C. § 4311(g).[18] As indicated by *Geier*, the presence of the savings

---

1397(k) (1988). Section 1397(k) is now codified with some changes at 49 U.S.C. § 30103(e).

   [18] The legislative history explains the savings clause as follows:
      "This section is a Committee amendment and is intended to clarify that compliance with the Act or standards, regulations, or orders promulgated thereunder, does not relieve any person from liability at common law or under State law. The purpose of the section is to assure that in a product liability suit mere compliance by a manufacturer with the minimum standards promulgated under the Act will not be a complete defense to liability. Of course, depending on the rules of evidence of the particular judicial forum, such

25

clause precludes a broad reading of the express preemption provision of section 4306. *See also Freytag v. Commissioner of Internal Revenue*, 111 S.Ct. 2631, 2638 (1991) ("Our cases consistently have expressed 'a deep reluctance to interpret a statutory provision so as to render superfluous other provisions in the same enactment.'") (quoting *Pennsylvania Dept. of Pub. Welfare v. Davenport*, 110 S.Ct. 2126, 2133 (1990)).[19] We accordingly are unable to conclude that section 4306 preempts more than positive enactments of law by a state or local legislature or administrative agency or official and extends to expressly preempt Lady's common-law tort action against OMC.

---

compliance may or may not be admissible for evidentiary value." S. REP. NO. 92-248 (1971), *reprinted in* 1971 U.S.C.C.A.N. 1333, 1352.

[19] A recent decision of the Tenth Circuit, albeit concerning a different act's preemption and savings clauses, supports our conclusion that the FBSA's express preemption clause cannot be given such a broad reading. In *Choate v. Champion Home Building Co.*, ___ F.3d ___, 2000 WL 1022251 (10th Cir. July 25, 2000), the Tenth Circuit held that, pursuant to the Supreme Court's teachings in *Geier*, the preemption clause of the National Manufactured Housing Construction and Safety Standards Act of 1974, 42 U.S.C. § 5403(d), did not preempt a tort action against the manufacturer of a mobile home, in light of the Manufactured Housing Act's also containing a savings provision which stated that "[c]ompliance with any Federal manufactured home construction or safety standard issued under this chapter does not exempt any person from liability under common law," 42 U.S.C. § 5409(c). *See Choate*, 2000 WL 1022251, at *3-4 ("Given the nearly identical nature of the preemption and saving clause provisions in the National Traffic and Motor Vehicle Safety Act and the Manufactured Housing Act, we hold, in light of *Geier*, that Choate and Madewell's claim is not expressly preempted.") (footnote omitted). The Tenth Circuit then considered implied conflict preemption, concluding that, because the common-law tort action did not conflict with the federal standard requiring a hard-wired smoke detector in manufactured homes nor thwart a federal policy, implied preemption did not lie. *See id*. at *6-7.

26

D    Implied Preemption

Our conclusion that Lady's action is not expressly preempted does not "foreclose[] any possibility of implied pre-emption." *Freightliner Corp. v. Myrick*, 115 S.Ct. 1483, 1488 (1995); *see Geier*, 120 S.Ct. at 1919 (stating that "the savings clause (like the express pre-emption provision) [of the National Traffic and Motor Vehicle Safety Act] does not bar the ordinary working of conflict pre-emption principles"); *Freightliner*, 115 S.Ct. at 1488 ("The fact that an express definition of the pre-emptive reach of a statute 'implies'–*i.e.*, supports a reasonable inference–that Congress did not intend to pre-empt other matters does not mean that the express clause entirely forecloses any possibility of implied pre-emption."). Implied conflict preemption "occurs when compliance with both state and federal law is impossible, or when the state law stands as an obstacle to the accomplishment and execution of the full purpose and objective of Congress." *Locke*, 120 S.Ct. at 1148 (internal quotations and citations omitted). As compliance with both a state common-law rule requiring a propeller guard and the Coast Guard's decision not to require propeller guards is not impossible, we address whether a common-law rule requiring a propeller guard would disrupt the results Congress sought to achieve with the enactment of the FBSA.

OMC argues that Congress enacted the FBSA to create a uniform system of requirements for recreational vessels. OMC maintains that the Coast Guard's decision not to require propeller guards amounts to a

27

determination that such a requirement is not appropriate, thus leaving manufacturers with the flexibility to choose an appropriate response to the safety issues presented by boat propellers. OMC contends that to allow common-law claims to impose a rule requiring propeller guards would eviscerate the Coast Guard's decision that such a requirement should not be imposed and destroy the flexible approach adopted by the Coast Guard.

In response, Lady contends that the Coast Guard's decision neither to require nor forbid propeller guards does not create a rule subject to uniform application. Lady asserts that a common-law claim that may impose a rule of boat and equipment safety standards is permissible, as long as the Coast Guard has not promulgated a regulation that conflicts with the common-law requirement. Accordingly, Lady argues, the Coast Guard's decision not to impose a safety standard on propellers leaves room for state common-law to impose a standard on the matter. In support of this position, Lady relies on *Freightliner*, in which the Court considered whether the absence of a federal standard on a safety matter implicitly preempted a state common-law action imposing such a standard.

In *Freightliner*, the Supreme Court considered whether common-law claims based on the failure to install anti-lock braking systems on tractor-trailers were expressly or impliedly preempted by the Motor Vehicle Safety Act. *See Freightliner*, 115 S.Ct. at 1486-87. The defendant manufacturers argued that such claims were preempted, because

28

the relevant agency had indicated an intent to regulate braking matters by prescribing a regulation on the matter. *See id*. at 1486. This regulation was later struck down by a court of appeals, but the defendants in *Freightliner* maintained that it still had preemptive effect, because it demonstrated an intent to forbid state regulation of braking systems. *See id*. at 1487.

The Court rejected the manufacturers' argument. No federal standard on the stopping distances or vehicle stability for trucks or trailers had been prescribed, and the Court determined that the absence of regulation did not constitute regulation, because "there is no evidence that [the Secretary] decided that trucks and trailers should be free from all state regulation of stopping distances and vehicle stability." *Id*. at 1487. "[T]he lack of federal regulation did not result from an affirmative decision of agency officials to refrain from regulating air brakes." *Id*. In the absence of federal action, the Court concluded that under the Motor Vehicle Safety Act the "States remain free to 'establish, or to continue in effect,' their own safety standards concerning those 'aspects of performance.'" *Id*. (quoting 15 U.S.C. § 1392(d)). Therefore, the Court held that "[a] finding of liability [based on the failure to install anti-lock brakes] would undermine no federal objectives or purposes with respect to [anti-lock braking] devices, since none exist." *Id*. at 1488. Accordingly, implied conflict preemption did not apply. In contrast to *Freightliner* where "the lack of federal regulation did not result from an affirmative

decision by agency officials to refrain from regulating," *id*. at 1487, the lack of a regulation mandating propeller guards on recreational boats came after the Coast Guard studied the matter and affirmatively determined that requiring propeller guards was substantively inappropriate. Therefore, *Freightliner*'s teachings do not preclude implied preemption in the present case.

In *Geier*, the Court again encountered the Motor Vehicle Safety Act–this time to decide whether a safety standard promulgated by the Secretary, FMVSS 208, preempted a common-law action based on the failure to install a driver's side airbag. FMVSS 208 gave vehicle manufacturers a choice as to whether or not to install airbags and pursued a gradual phase-in of airbag and passive restraint systems. *See Geier*, 120 S.Ct. at 1917, 1924; *see also id*. at 1922 (The Department of Transportation's "comments, which accompanied the promulgation of FMVSS 208, make clear that the standard deliberately provided the manufacturer with a range of choices among different passive restraint devices."). After concluding that the Motor Vehicle Safety Act did not expressly preempt Geier's claims, the Court addressed implied preemption. *See id*. at 1919-28. The Court noted that the rule of state tort law Geier sought to impose by her lawsuit "would have required manufacturers of all similar cars to install airbags rather than other passive restraint systems, such as automatic belts or passive interiors." *Id*. at 1925; *see id*. ("[Geier's lawsuit] would have required all manufacturers to have installed airbags in respect to the entire District-of-Columbia-

30

related portion of their 1987 new car fleet, even though FMVSS 208 at that time required only that 10% of a manufacturer's nationwide fleet be equipped with any passive restraint device at all."). Therefore, the Court determined that Geier's tort claims "would have presented an obstacle to the variety and mix of devices that the federal regulation sought . . . [and] also would have stood as an obstacle to the gradual passive restraint phase-in that the federal regulation deliberately imposed." *Id*. Because the rule of law for which Geier pursued through her tort action "would have stood 'as an obstacle to the accomplishment and execution of' the[se] important means-related federal objectives . . ., it is pre-empted." *Id* (quoting *Hines v. Davidowitz*, 61 S.Ct. 399, 404 (1941)).

In *Geier*, the Court held that FMVSS 208 was to be given pre-emptive effect over conflicting state laws. *See id*. at 1928. OMC contends that we should apply this rule to preempt Lady's action. However, unlike the situation in *Geier*, OMC's contention does not rest upon a prescribed safety standard, but rather a decision not to prescribe a standard, in which the Coast Guard, after considering whether to require propeller guards, decided that "[t]he U.S. Coast Guard should take no regulatory action to require propeller guards." Letter from Robert T. Nelson, Rear Admiral, U.S. Coast Guard, Chief, Office of Navigation Safety and Waterway Services, to A. Newell Garden, Chairman, National Boating Safety Advisory Council (Feb. 1, 1990). An agency decision not to regulate does not always, or perhaps even usually, carry a preemptive

31

effect. *See Freightliner*, 115 S.Ct. at 1488; *Puerto Rico Dept. of Consumer Affairs v. Isla Petroleum Corp.*, 108 S.Ct. 1350, 1355 (1988). Yet, "a federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left *un*regulated, and in that event would have as much pre-emptive force as a decision *to* regulate." *Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n*, 103 S.Ct. 1905, 1912 (1983) (citations omitted). This is so where the "failure of . . . federal officials affirmatively to exercise their full authority takes on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute, States are not permitted to use their police power to enact such a legislation." *Ray v. Atlantic Richfield Co.*, 98 S.Ct. 988, 1004-05 (1978) (quotations and citations omitted).

In *Ray*, the Court considered whether federal law preempted the State of Washington's enactment of a law "exclud[ing] from Puget Sound under any circumstances any tanker in excess of 125,000 DWT [or deadweight tons]." *Id.* at 1002. Because section 1222(b) of the Ports and Waterways Safety Act (PWSA) prohibited a state from imposing higher safety standards than those prescribed by the Secretary of Transportation under Title I of the PWSA, the Court held that Washington's size limitation for vessels in Puget Sound was unenforceable. *See id.* at 1003. The Court went further, stating that "even without § 1222(b), we would be reluctant to sustain the [Washington's] Tanker Law's absolute ban on tankers larger than 125,000

32

DWT." *Id*. at 1004.  The Court found this to be appropriate in light of the Coast Guard's local navigation rule for the Rosario Strait.  *See id*. at 1004; *see also id*. at 1007 ("The Coast Guard's unwritten 'local navigation rule[]' . . . prohibits passage of more than one 70,000 DWT vessel through Rosario Strait at any given time . . ..") (Marshall, J., dissenting, joined by Brennan and Rehnquist, JJ.).  The Secretary of Transportation, through the Coast Guard, had issued "the Puget Sound Vessel Traffic System containing general rules, communication rules, vessel movement reporting requirements, a traffic separation scheme, special rules for ship movement in Rosario Strait, descriptions and geographic coordinates of the separation zones and traffic lanes, and a specification for precautionary areas and reporting points." *Id*. at 1001.  The local navigation rule governing traffic in the Rosario Strait "prohibited the passage of more than one 70,000 DWT vessel through Rosario Strait in either direction at any given time . . . [and] [d]uring the periods of bad weather, [reduced] the size limitation . . . to approximately 40,000 DWT." *Id*. (internal quotations and citations omitted).  Because of this prescription of a narrow limit on vessels in the Rosario Strait, the Secretary of Transportation's failure to promulgate a ban on the operations of oil tanker in excess of 125,000 DWT in Puget Sound constituted a decision that no such regulation is appropriate pursuant to the policy of the PWSA.  *See id*. at 1004-05; *see also id*. at 1003 ("[I]t appears sufficiently clear that federal authorities have indeed dealt with the issue of size and have determined

33

whether and in what circumstances tanker size is to limit navigation in Puget Sound. The [Washington] Tanker Law purports to impose a general ban on large tankers, but the Secretary's response has been a much more limited one."). In *Locke*, the Supreme Court defined the relevant inquiry in *Ray* "as whether the Coast Guard promulgated its own requirement on the subject or has decided that no such requirement should be imposed at all." *Locke*, 120 S.Ct. at 1148 (citations omitted).[20] Although the issue is an extremely close one, we conclude that the Coast Guard's decision not to require propeller guards on recreational vessels takes on a similar character.

In refusing to require propeller guards, the Coast Guard stated as follows:

> "Available propeller guard accident data do not support imposition of a regulation requiring propeller guards on motorboats. Regulatory action is also limited by the many questions about whether a universally acceptable propeller guard is available or technically feasible in all modes of boat operation." Letter from Robert T. Nelson, Rear Admiral, U.S. Coast Guard, Chief, Office of Navigation Safety and Waterway Services, to A. Newell Garden, Chairman, National Boating Safety Advisory Council (Feb. 1, 1990).

After the Coast Guard studied the need for mandating propeller guards on recreational vessels, it decided that, in the absence of more information on propeller strike accidents, such a requirement was not warranted, choosing instead to leave manufacturers with the option of

---

[20] The *Locke* Court reaffirmed the principles set forth in *Ray*, holding that the State of Washington's post-*Ray* regulations on the design and construction of tankers traversing Puget Sound remained subject to preemption by the comprehensive federal regulatory scheme governing oil tankers. *See id*. at 1148-50.

whether or not to attach a propeller guard and, if so, what type. A damage award in favor of Lady would effectively require boat manufacturers to install propeller guards, in direct contravention to the Coast Guard's policy against mandating such a device in favor of affording manufacturers flexibility in the matter. *See San Diego Building Trades Council v. Garmon*, 79 S.Ct. 773, 780 (1959) ("[State] regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy."); *MacDonald*, 27 F.3d at 1025 ("If plaintiffs could recover large damage awards because the herbicide was improperly labeled under state law, the undeniable practical effect would be that state law *requires* additional labeling standards not mandated by [federal law]."); *see also Lewis*, 107 F.3d at 1505; *Carstensen*, 49 F.3d at 432 (both holding that a product liability claim against a boat manufacturer, like Lady's, seeks to impose a propeller guard requirement). Accordingly, the rule of law sought to be imposed by Lady would present an obstacle to and frustrate the flexible approach towards propeller guards adopted by the Coast Guard. *See Geier*, 120 S.Ct. at 1925. Therefore, Lady's action is impliedly preempted by the Coast Guard's considered decision that, on the merits of the matter, imposing a requirement for propeller guards was substantively inappropriate. *See Locke*, 120 S.Ct. at 1148 (stating that regulations, in certain contexts, may "be given pre-emptive effect over conflicting

35

state laws").[21]

We do not hold that simply because the Coast Guard has not acted on a safety matter that state action is precluded. Rather, where the Coast Guard has been presented with an issue, studied it, and affirmatively decided as a substantive matter that it was not appropriate to impose a requirement, that decision takes on the character of a regulation and the FBSA's objective of national uniformity mandates that state law not provide a result different than the Coast Guard's. For example, if Lady's state common-law tort action against OMC concerned a manufacturing or design issue never presented to or considered by the Coast Guard, implied preemption would not apply, because there would be no federal action to be contravened by a successful tort claim. Although this dichotomy in analyzing the preemption of state common-law claims under the FBSA and Coast Guard regulatory decisions will not necessarily lead to complete nation-wide uniformity in the rules governing the manufacturing and design of recreational vessels, the goal for uniformity, as indicated in the FBSA's preemption clause, 46 U.S.C. § 4306, and the Coast Guard's regulations, must be balanced with Congress's willingness to accept some state action, as evinced in the FBSA's savings clause, 46 U.S.C. §

---

[21] The preemptive effect of Coast Guard regulations is reinforced by the actions taken by the Coast Guard after the FBSA's enactment in 1971—specifically, granting a blanket exemption from preemption for then-existing state and local laws on recreational boats, *see* 36 Fed. Reg. 15764-65 (1971), and later replacing the blanket exemption with a more limited one, *see* 38 Fed. Reg. 6914-15 (1973).

4311(g).[22] Lady's claims, however, fall on the side of the dichotomy where the Coast Guard has studied a matter and affirmatively decided that imposing a requirement was substantively inappropriate.

Thus, we conclude that, at least in the instant maritime context where the federal interest and presence has traditionally been so significant and there is no presumption against preemption, implied preemption precludes Lady's action against OMC.[23]

## Conclusion

For the reasons stated, the judgement of the district court is

---

[22] We also conclude that product liability claims based on the defective design, manufacture, or installation of products that are already installed and not subject to Coast Guard regulation are also not preempted. *See Lewis*, 107 F.3d at 1504-05 (citations omitted).

[23] In arguing against preemption, Lady relies on the Solicitor General's position before the Supreme Court in *Lewis*. Appearing as *amicus curiae* for the United States, the Solicitor General urged the Court to reverse the Eleventh Circuit's judgment in *Lewis*. The Solicitor General maintained that the FBSA and the Coast Guard's decision not to require propeller guards neither expressly nor impliedly preempted state tort claims alleging that the manufacturer should have installed a propeller guard. In finding implied preemption in *Geier*, the Court "place[d] some weight upon [Department of Transportation]'s interpretation of FMVSS 208's objectives and its conclusions, as set forth in the Government's brief." *Geier*, 120 S.Ct. at 1926. In accepting the view presented by the Solicitor General, the Court noted that "[w]e have no reason to suspect that the Solicitor General's representation of [Department of Transportation]'s views reflects anything other than 'the agency's fair and considered judgment on the matter.'" *Id*. at 1927 (quoting *Auer v. Robbins*, 117 S.Ct. 905, 912 (1997)). The Solicitor General, however, has not appeared in this case; therefore, his views on the matter are not before us. Moreover, even if we were to consider the position taken by the Solicitor General in *Lewis*, the weight we would place on it would not be sufficient to overcome the reasons supporting the application of implied preemption.

AFFIRMED.